HON. THOMAS S. ZILLY
Noted for Consideration: April 24, 2020
ORAL ARGUMENT REQUESTED

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

DEVITTA BRISCOE, individually, and as
executor of the Estate of Che Andre Taylor;
JOYCE DORSEY, individually; CHE ANDRE
TAYLOR, JR., individually; and SARAH
SETTLES on behalf of her minor child,
███████████████, and DEMEKA
GREEN for the Estate of Brenda Taylor,

                              Plaintiffs,

        vs.

CITY OF SEATTLE; MICHAEL
SPAULDING and "JANE DOE SPAULDING,
and their marital community composed thereof;
SCOTT MILLER and "JANE DOE" MILLER,
and their marital community composed thereof;
TIMOTHY BARNES and "JANE DOE"
BARNES, and their marital community
composed thereof; and AUDI ACUESTA and
"JANE DOE" ACUESTA, and their marital
community composed thereof,

                              Defendants.

No.     2:18-cv-00262-TSZ

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

**Noted for Consideration: April 24, 2020
ORAL ARGUMENT REQUESTED**

/

/

/

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 1
2:18-CV-00262

Under Fed. R. Civ. P. 56(a), Defendants City of Seattle, Michael Spaulding, Scott Miller, Timothy Barnes, and Audi Acuesta ("Defendants") respectfully request this Court to grant summary judgment and dismiss all of Plaintiffs' claims as a matter of law.

## I.     STATEMENT OF MATERIAL FACTS

On February 21, 2016, Seattle Police Officers Scott Miller and Michael Spaulding were working in plain clothes in an unmarked police car, doing undercover surveillance on a known drug house at NE 85th Street and 21st Avenue in Seattle.  (Declaration of Scott Miller, Ex. A, p. 3; Declaration of Michael Spaulding, Ex. A, p. 3.)  Both officers were working for the Seattle Police Department's Anti-Crime Team (ACT).[1]  (Spaulding Inquest, 990:3-23;[2] S. Miller Decl., ¶ 3.)  The officers wore street clothes, but both officers had police insignia on some of their attire.  (S. Miller Inquest, 1230:18-1231:19; Deposition of Michael Spaulding, 54:6-22; Spaulding Decl., Ex. A, p. 3, 22.)

At approximately 1540 hours, Officers Spaulding and Miller observed a black Dodge Magnum pull up and park in front of the house they were surveilling.  (Spaulding Decl., Ex. A, pp. 3-4; S. Miller Decl., Ex. A, p. 3.)  Both Officer Miller and Officer Spaulding recognized Taylor, with Officer Spaulding exclaiming, "that's Che."   (S. Miller Inquest, 1241:5-14; Spaulding Inquest, 1006:2-1007:15.)  Both officers recognized him as Che Taylor, a person recently released from prison and who was now dealing narcotics.  (Spaulding Inquest, 1006:2-1007:15; Spaulding Decl., Ex. A, p. 4.)  As Officer Spaulding was writing in a notepad, Officer Miller asked Officer Spaulding, "did you see that?" and Officer Spaulding asked what Officer Miller was talking about.

---

[1] The Seattle Police Department's Anti-Crime Team is composed of 6-8 officers focused on street-level narcotics and vice activity, as well as other tasks assigned by the precinct commander. (S. Miller Decl., ¶ 3.)
[2] Inquest transcript portions are attached to Sharifi Dec. as Exhibits 4(a) – 4(e).

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 2
2:18-CV-00262

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

(Spaulding Inquest, 1006:2-1007:15.)  When Taylor exited his vehicle, Officer Miller observed a black handgun in a holster on Taylor's right hip.  (S. Miller Inquest, 1238:12-1240:18.)  Officer Miller told Officer Spaulding that Che Taylor had a gun on his right hip.  (*Id*.)  Officer Spaulding did not see the gun because he was running the license plate.  (*Id*.)  Officer Miller said the gun looked like a Glock.  (*Id*.)  At 1540 hours, Officer Miller ran Taylor's name through various databases to check for warrants and confirmed that he was a convicted felon and an armed career criminal.  (S. Miller Inquest, 1274:13-1276:2; S. Miller Decl., Ex. A, p. 3; Spaulding Decl., Ex. A, p. 2.)  And both officers knew Taylor was a convicted felon for robbery and rape.  (Spaulding Inquest, 1007:10-11.)

Taylor pulled his vest down over his gun, closed his car door, and then walked north, toward the apartment that Officers Miller and Spaulding were surveilling.  (S. Miller Inquest, 1241:17-1242:6.)  Officer Miller watched Taylor enter the apartment.  (*Id*.)  Once Taylor entered the apartment, Officers Miller and Spaulding discussed their plan and the importance of taking Taylor into custody.  (S. Miller Inquest, 1244:11-1245:4.)  They could not allow Taylor to drive away in his car while armed with a handgun.  (S. Miller Decl., Ex . A, p. 10.)  They requested additional units respond to their location, because they would be arresting an armed felon with a handgun.  (S. Miller Inquest, 1244:11-1245:4; Spaulding Inquest, 1011:3-1013:1.)  The officers planned to take Taylor into custody once he crossed into the intersection of NE 21st and 85th on his way back to his car.  (*Id*., 1245:19-1246:4.)  ACT Sergeant Christman arranged for a marked, two-officer patrol unit to assist them.  (*Id*., 1246:5-25.)  This was to eliminate any doubt in Taylor's mind that the officers were police.  (*Id*., 1247:1-4.)  They also wanted a marked unit on the scene,

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

because it would have in-car video[3] and it would alert the public, and Taylor, there was a police operation happening.  (Deposition of Scott Miller, 79:25-80:21.)

Seattle Police Officers Audi Acuesta and Timothy Barnes were on patrol in full uniform and a marked patrol car in the North Precinct.  (Declaration of Audi Acuesta, ¶ 3, Ex. A, p. 1.; Declaration of Timothy Barnes, ¶ 3, Ex. A, p. 1.)  Officers Acuesta and Barnes were dispatched at 1545 hours to assist Officers Spaulding and Miller in the arrest of Che Taylor, a known felon seen in possession of a firearm.  (*Id*.; *Id*.)  Officers Barnes and Acuesta drove to a nearby Chinese restaurant parking lot and were advised that the plan was to move in and arrest Taylor after he exited the apartment complex and was walking towards his vehicle.  (*Id*.; *Id*. S. Miller Decl., Ex. A, p. 4.)  As they waited in the parking lot, Officer Barnes ran Taylor's name to gather information and learned that he was a Potential Armed Career Criminal.  (Barnes Decl., Ex. A, p. 1.)  Officer Miller also told them the patrol units would stage nearby.  (S. Miller Decl., Ex. A, p. 4.)  Officer Miller informed Officers Acuesta and Barnes they would assist in taking Taylor into custody and of the arrest plan. (S. Miller Dep., 72:8-73:2; Spaulding Decl., Ex. A, pp. 4-5; S. Miller Decl., Ex., p. 9; Spaulding Inquest, 1017:14-1019:15.)  The officers wanted to apprehend Taylor before he got to his Dodge Magnum, to eliminate the possibility of a car chase and to keep him from getting into a car with tinted windows where officers could not see his actions.  (Spaulding Decl., Ex. A, p. 14.)  They also discussed that they did not want to allow Taylor to go back into the apartment, as he could then become an armed, barricaded subject who could also take hostages, as they knew there were other people in the apartment.  (S. Miller Decl., Ex. A, p. 5.)

Officer Chuck Miller was also staged to the east and was informed of the plan.  (Spaulding

---

[3] The relevant portions of the In Car Video related to this underlying incident are attached and referenced in the Declaration of William Neale Exhibits C-F. The full video was also previously referenced and filed with the Court as Dkt. 34-2.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 4
2:18-CV-00262

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

Inquest, 1017:14-1019:15; C. Miller Inquest, 803:8-804:15.)  Officers Miller and Spaulding had worked together and trained together, and due to the risk of the arrest, they would be the officers to take Taylor into custody.  (S. Miller Decl., Ex. A, p. 9.)  Officers Barnes and Acuesta could then provide additional "hands-on" during the arrest, if necessary.  (*Id*.)

At 1603 hours, Officers Spaulding and Miller advised that Taylor exited the building. (Barnes Decl., Ex. A, p. 1.)  Officers Barnes and Acuesta waited for approximately five minutes, before moving closer to the location of Officers Spaulding and Miller.  (*Id*.)  Meanwhile, as they waited, Officers Spaulding exposed their "police" markings, with Spaulding removing a sweatshirt to expose his vest, and Miller pulling out the patches on his jacket.  (Spaulding Decl., Ex. A, p. 12.)

After his initial arrival, Officers Spaulding and Miller watched Taylor as he spoke with people near the doorway of the apartment.  (S. Miller Decl., Ex. A, p. 5.)  Taylor then walked back toward the apartment and continued talking to people near the doorway.  (*Id*.)  After a few minutes, Officer Spaulding told Officer Miller he could not see Taylor anymore.  (*Id*.)  Officer Spaulding could not tell where he went, because a vehicle had parked on the street and blocked their view. (*Id*.)  Someone then drove away in that vehicle.  (*Id*.)  The officers continued to monitor the apartment, and observed a white car pull up in front of the apartment, 10 to 15 feet in front of the officers' position.  (Spaulding Decl., Ex. A, p. 5; S. Miller Decl., Ex. A, pp. 5-6.)  They observed a white male driver and a passenger in the back seat.  (*Id*.; *Id*.)  Officer Miller also saw a male in the front that looked like Taylor.  (*Id*.; *Id*.)  The front passenger exited the vehicle and both officers recognized him as Taylor.  (*Id*.; *Id*.)

At 1615 hours, Officers Spaulding and Miller advised Officers Barnes and Acuesta that Taylor was in a white vehicle and requested they move in to assist in making the arrest.  (Spaulding

Decl., Ex. A, p. 15; S. Miller Decl., Ex. A, p. 6; Barnes Decl., Ex. A, p. 1; Acuesta Decl., Ex. A, p. 1; C. Miller Inquest, 805:8-20.)  Officers Barnes and Acuesta drove to Miller and Spaulding's location.  (Barnes Decl., Ex. A, p. 1; Acuesta Decl., Ex. A, p. 1.)  Knowing that patrol officers were in route, Officers Miller and Spaulding exited their vehicles with their long guns drawn and gave Taylor commands to show his hands and get on the ground.  (Spaulding Decl., Ex. A, p. 6; S. Miller Decl., Ex. A, p. 6.)  Officer Spaulding addressed Taylor by name, and Taylor looked at him.  (*Id.*)  Taylor looked at Officer Spaulding, and asked, "what's going on?"  (Spaulding Inquest, 1039:1-1040:18.)  Officer Spaulding told Taylor to "get on the ground now" and Taylor responded, "okay, okay, okay."  (Id.)  The in-car video from Officer Barnes' patrol car captured part of the incident, including the officers moving toward Taylor with weapons drawn, giving him commands.  (Dkt. 34-2 at 18:20.[4])

Officer Spaulding, wearing a short-sleeved shirt and bullet-proof vest, approached from the rear driver's side of the white sedan. (Dkt. 34-2 at 18:25.)  Officer Miller approached from the same direction, a few steps behind Officer Spaulding.  (*Id.*)  Both officers identified themselves as Seattle police.  (Spaulding Decl., Ex. A, p. 6.; S. Miller Inquest, 1254:3-24.)  As Officers Miller and Spaulding moved around the rear of the white sedan towards him, Taylor looked at them, raised his hands to approximately shoulder height, and moved down toward the ground.  (*Id*. at 18:26; Spaulding Inquest, 1040:8-25; S. Miller Decl., pp. 6-7; Declaration of William Neale, Exs. B-F).  Both officers were commanding Taylor to show his hands and get on the ground.  (Dkt. 34-2 at 18:26; Neale Decl., Exs. C-F; S. Miller Decl., Ex. A, p. 7; S. Miller Inquest, 1265:16-1266:4.)  By this point in time, Officers Barnes and Acuesta arrived on-scene in their marked vehicle.  (Barnes Decl., Ex. A, p. 1; Acuesta Decl., Ex. A, p. 1.; S. Miller Decl., Ex. A, pp. 6-7.)  As they pulled up,

---

[4] This time-stamp references the playback time and not the elapsed time in the video.

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

they observed Officers Miller and Spaulding moving towards Taylor, who was standing outside the white vehicle on the passenger side, with their weapons drawn, giving Taylor commands to show his hands. (Barnes Decl., Ex. A, p. 1; Acuesta Decl., Ex. A, p. 1.)  Officer Miller saw Taylor look at the approaching patrol car and Suburban with their lights on, which told him Taylor knew they were all police.  (S. Miller Decl., Ex. A, pp. 6-7.)  Officer Miller observed a change in Taylor's expression he recognized from other situations and led him to believe Taylor knew he was going back to jail, which elevated the risk.  (S. Miller Decl., Ex. A, p. 15.)

While Taylor appeared to comply with commands at first, once Officers Spaulding and Miller got closer, Taylor ceased going to the ground and instead leaned into the passenger door of the vehicle.  (Spaulding Decl., Ex. A, p. 6; S. Miller Decl., Ex. A, p. 7.)  As Taylor crouched forward into the passenger doorway, his right arm went down to his right hip, which was on the opposite side of him as the officers.  (Spaulding Decl., Ex. A, p. 6, 19-20; Id.; Spaulding Inquest, 1040:19-1041:12; S. Miller Inquest, 1257:4-1258:3.)  Taylor's elbow moved straight up vertically, and each officer immediately recognized that movement as Taylor drawing the gun that Officer Miller had observed on his right hip earlier that day.  (Id.; Neale Decl., Exs. D & E.)  Officer Miller realized that Taylor had just drawn his firearm.  (S. Miller Inquest, 1260:9-11; S. Miller Decl., Ex. A, p. 7.)  Officer Spaulding saw Taylor motion with his right arm and also recognized it as Taylor pulling the gun from the holster on his right hip.  (Spaulding Decl., Ex. A, p. 6; Spaulding Inquest, 1041:8-12.)  Officer Spaulding, who was now next to Taylor, yelled "hey no! hey no!"  (Dkt. 34-2 at 18:27-18:32; Spaulding Inquest, 1076:6-1077:20.)

Both officers Spaulding and Miller perceived their lives were in imminent danger, and they fired their weapons. (Spaulding Decl., ¶ 4, Ex. A, p. 6, 32-33; S. Miller Decl., ¶ 4, Ex. A, pp. 7-8, 30; Dkt. 34-2 at 18:27-18:32; Neale Decl., Exs. C-F; Spaulding Inquest, 1078:23-1079:22.)

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 7
2:18-CV-00262

Officer Miller fired one round from his shotgun, aiming for center mass (upper torso).  (S. Miller Decl., Ex. A, p. 7, 29.)  Officer Spaulding fired six rounds from his department-issue Colt M4 .223 caliber rifle.  (Spaulding Inquest 1081:8-19.)

As he walked around the vehicle to make sure it was safe, Officer Charles Miller saw a handgun on the front passenger floor.  (C. Miller Inquest, 826:14-828:5; Declaration of Charles Miller, Ex. A.)  He yelled out, "gun!"  (*Id.*)  Just after the shooting, Officer Scott Miller also saw the butt of a gun on the floorboard of the passenger side of the vehicle.  (S. Miller Decl., Ex. A, pp. 6-7.)  Officer Barnes likewise saw the handgun on the floor.  (Barnes Inquest, 576:15-577:15.)  Officer Spaulding looked at Taylor once he was on the ground and saw a black handgun holster on Taylor's right hip, and it appeared attached to Taylor's belt.  (Spaulding, Decl., Ex. A, p. 20.)  Officer Acuesta also saw the holster on Taylor's right hip.  (Acuesta Inquest, 439:3-11.)  Officer Acuesta can be heard on the video saying, "he has a holster on his right hip."  (Dkt. 34-2 at 22:50-55.)

Officers promptly radioed for medical aid.  (Acuesta Decl., Ex. A, p. 1; S. Miller Decl., Ex. A, p. 8.)  Officers also took the other two occupants of the Ford Taurus into custody.  (Dkt. 34-2 at 19:00-23:00.)  Once Taylor was secured, Officer Escalante commenced CPR until aid arrived.  (S. Miller Decl., Ex. A, p. 8; Spaulding Decl., Ex. A, p. 7.)  A black handgun was later recovered from underneath the passenger seat of the white Ford Taurus.  (Declaration of Lisa Haakenstad, ¶ 3, Exs. A & B; C. Miller Decl., Ex. A.)  Officers also found a copious amount of suspected illegal narcotics on Taylor's person.  (*Id.*, ¶ 4, Ex. C.)

Because Officers Miller and Spaulding were working undercover, they did not have to carry on their persons, nor would it have been prudent or safe for them to carry less lethal options, like

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

Tasers or OC spray.[5]  (S. Miller Decl., ¶ 5.)  Carrying such less lethal tools on their persons would have compromised their undercover status, as it requires wearing a duty belt, which would be visible and flag the officers as police.  (*Id.*)  Further, because Taylor was threatening them with a gun, less lethal would not be a safe or reasonable force option.  (*Id.*)  The officers were trained to meet a deadly threat like a suspect wielding a firearm with deadly force.  (*Id.*)  Attempting to counteract Taylor's lethal threat with a Taser or OC spray would be reckless and wholly inconsistent with law enforcement training at SPD and throughout the state of Washington.  (*Id.*) Police practices expert Jeffrey Noble evaluated the facts and circumstances surrounding this incident and opines that the officers' conduct was consistent with police practices.[6]  Plaintiffs' police practices expert, Gregory Gilbertson, has no opinion regarding the sufficiency of the City's training of its police officers.  (Mar. 25. 2020 Deposition of Gregory Gilbertson, 6:25-7:4.) Gilbertson does not contest that the officers had probable cause to arrest Taylor.  (*Id.*, 54:8-17.)

### III.  ARGUMENT AND AUTHORITIES

**A.      Summary Judgment Standard**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Then, the opposing party must set forth specific facts to show a genuine issue of fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

---

[5] The officers did have OC spray and a baton with them in their vehicle.  (Spaulding Decl., Ex. A, p. 22.)
[6] Defendants will move separately to exclude the opinions and testimony of Plaintiffs' police practices expert, Gregory Gilbertson. That motion is incorporated by this reference.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 9
2:18-CV-00262

1  Uncorroborated allegations and "self-serving testimony" will not create a genuine issue of material

2  fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

3  **B.      The Court Should Dismiss Plaintiff's Fourth Amendment Claims**

4          Though not pleaded, Taylor's estate alludes to claims for alleged Fourth Amendment

5  violations under 42 U.S.C. § 1983 for false arrest and unreasonable seizure.[7]   To sustain a cause of

6  action under § 1983, a plaintiff must show (1) that he suffered a violation of his rights protected by

7  the Constitution or created by federal statute, and (2) that the violation was proximately caused by a

8  person acting under color of state law. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S. Ct. 1908 (1981);

9  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  The Court should dismiss these claims.

10         *1)  There Was Probable Cause to Arrest Taylor.*

11         Plaintiffs claim Defendants are liable for false arrest. Whether this claim is brought under §

12 1983 or Washington common law, it fails.  To prove a claim of false arrest, plaintiff must show

13 Defendants arrested Taylor without probable cause. *See Michigan v. Summers*, 452 U.S. 692, 700

14 (1981); *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998)  Probable cause exists

15 when the totality of the circumstances within an officer's knowledge would cause a reasonably

16 prudent person to believe that a crime has been, or is being committed. *Lassiter v. City of Bremerton*,

17 556 F.3d 1049, 1053 (9th Cir. 2009).  Probable cause is an absolute defense to a claim of false arrest

18

19

---

20 [7] Plaintiffs do not explicitly reference 42 U.S.C. § 1983 or the Fourth Amendment as the vehicle for their false arrest and "unlawful seizure" claims, and instead bring only claims for Fourteenth Amendment substantive due process

21 violations under § 1983.  (Dkt. 64, ¶¶ 5.3-5.7.)  Plaintiffs claim Defendants are liable to all Defendants for false arrest and unlawful seizure.  (*Id.*, ¶ 5.3-5.4.)  However, only Officers Miller and Spaulding arrested and seized Che Taylor,

22 whose estate may bring a claim for those alleged torts.  *See Ostling v. City of Bainbridge Island*, 872 F. Supp. 2d 1117, 1124-25 (W.D. Wash. 2012) (Washington's survival statute (RCW 4.24.046) supplied no individual standing to non-dependent parents and sister of mentally-ill decedent to pursue individual's § 1983 Fourth Amendment excessive force

23 claim against city Defendants.)  All other Plaintiffs' claims for false arrest and unlawful seizure should be summarily dismissed.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 10
2:18-CV-00262

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

and false imprisonment.  *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995); *Hanson v. City of Snohomish*, 121 Wn.2d 552, 563-64, 852 P.2d 295 (1993).

Here, Officer Miller observed Taylor exit his Dodge Magnum with a handgun in a holster on his right hip.  Any argument from Plaintiffs that disputes Officer Miller's observation is just that – argument, not competent evidence.  Given Officer Miller's observation of Taylor possessing a firearm, and Taylor's status as a convicted felon just recently released from a lengthy prison sentence, the officers undoubtedly had probable cause to arrest. Plaintiffs' police practices expert agrees. (Gilbertson Dep., 54:8-17.)  Both officers knew what Taylor looked like.  They received criminal database returns on Taylor indicating he was a felon and armed career criminal.  Given that fact, Taylor was committing a felony in the officers' presence.  RCW 9.41.010; 9.41.040(1)(a).  This established probable cause to arrest Taylor.  The Court should dismiss all false arrest claims.

### 2)  *The Officers Used Reasonable Force.*

Plaintiff's core claim is that Officers Miller and Spaulding violated Taylor's Fourth Amendment right to be free from unreasonable seizure by using excessive force.[8]  The general test for whether force is reasonable or excessive is in *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865 (1989).  Excessive force claims are evaluated under the Fourth Amendment's reasonableness standard, and the court considers "'(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (*citing Graham*, 490 U.S. at 396).  The Ninth Circuit also considers the availability of alternative methods of capturing or subduing a suspect.  *Id*. at 703.

---

[8] Plaintiffs assert claims against all Defendants.  However, it cannot be disputed that Officers Acuesta and Barnes did not use any force against Mr. Taylor and they did not arrest him.  The Court should dismiss all Fourth Amendment claims against Officers Acuesta and Barnes, as they did not have any individual participation in the seizure.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 11
2:18-CV-00262

1    Reasonableness is assessed from the perspective of an objectively reasonable officer on the

2    scene, rather than with the 20/20 vision of hindsight, and must allow for the fact that "police officers

3    are often forced to make split-second judgments – in circumstances that are tense, uncertain, and

4    rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*,

5    490 U.S. at 396. "To be sure, an officer will not be held liable if the circumstances under which the

6    force was used evolved so rapidly that a reasonable officer would not have had time to recalibrate

7    the reasonable quantum of force." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 733 (7th Cir. 2013);

8    *see, e.g., Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1230 (9th Cir. 2014), *reversed

9    in part on other grounds*, 135 S. Ct. 1765 (2015).

10    "Where the officer has probable cause to believe that the suspect poses a threat of serious

11    physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent

12    escape by using deadly force." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Tennessee

13    v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694 (1985)). And "where a suspect *threatens* an officer with

14    a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith*, 394 F.3d at

15    704 (emphasis added). "If the person is armed—or reasonably suspected of being armed—a furtive

16    movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George

17    v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).

18    It is well established that using deadly force is not constitutionally unreasonable "if the

19    suspect threatens the officer with a weapon" or "where the officer has probable cause to believe that

20    the suspect poses a threat of serious physical harm, either to the officer or others." *Ting v. United

21    States*, 927 F.2d 1504, 1510 (9th Cir. 1991) (citing *Garner*, 471 U.S. at 11–12); *see also Blanford

22    v. Sacramento County.*, 406 F.3d 1110, 1119 (9th Cir. 2005) (deputies' use of deadly force against

23    suspect who "was armed with a dangerous weapon, was told to stop and drop it, was warned that he

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 12
2:18-CV-00262

would be shot if he didn't comply, appeared to flaunt the deputies' commands by raising the sword and grunting, refused to let go of the sword, and was intent upon trying to get inside a private residence or its backyard with the sword in hand" was not objectively unreasonable or unconstitutional). Clearly established law provides that "[a] reasonable use of deadly force encompasses a range of conduct, and the availability of a less intrusive alternative will not render conduct unreasonable." *Wilkinson v. Torres,* 610 F.3d 546, 551 (9th Cir. 2010) (citing *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir. 1994)). Further, "[i]t stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014). In *Plumhoff*, the Court implicitly rejected that the reasonableness of force used depended upon the number of rounds fired. *Id*. The *Plumhoff* Court acknowledged, "if lethal force is justified, officers are taught to keep shooting until the threat is over." *Id*.

Here, the *Graham* factors weigh in the officers' favor. First, Taylor was committing a dangerous, felony crime – possessing a firearm. The officers knew he had been imprisoned for violent crimes and the criminal database searches indicated he was an "armed career criminal." Taylor committed this felony crime in the officers' presence, and his immediate arrest was necessary to ensure public safety.

Regarding the second and third *Graham* factors, Taylor undisputedly posed an imminent threat of death or serious bodily harm while resisting arrest. As they approached to take Taylor into custody, both officers saw Taylor reach for a gun on his right hip, bringing his right arm and elbow up in a distinctive motion that left no doubt in their minds precisely what Taylor was doing. The officers did not have to wait until Taylor produced the gun to defend themselves from that deadly threat. *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001) ("An officer is not constitutionally

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 13
2:18-CV-00262

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

1   required to wait until he sets eyes upon the weapon before employing deadly force to protect himself

2   against a fleeing suspect who turns and moves as though to draw a gun"); *Estate of Moppin-*

3   *Buckskin v. City of Oakland*, No. C 08-04328 CW, 2010 U.S. Dist. LEXIS 2148, *13, 2010 WL

4   147976 (N.D. Cal. 2010) (reasonable to use deadly force against suspect who fled traffic stop, failed

5   to follow orders, dropped his hands, and "made a movement toward his waist area as though reaching

6   for a weapon").

7        Plaintiffs may argue that the officers' use of deadly force was unreasonable, because neither

8   actually saw a gun in Taylor's right hand at the time of shooting.  The law does not support such an

9   argument.  The reasonableness inquiry does not require officers to delay their fire until a suspect

10  turns a weapon on them. *Garcia v. United States*, 2018 WL 1448744, at *4 (C.D. Cal.

11  2018)(unpublished decision) (citing *George*, 736 F.3d at 838; *see also Jean-Baptiste v. Gutierrez*,

12  627 F.3d 816, 821 (11th Cir. 2010) ("Regardless of whether [the suspect] had drawn his gun,

13  [his] gun was available for ready use, and [the officer] was not required to wait and hope for the best

14  [before using deadly force to stop him].") (quotation marks omitted).  "[W]hen an officer reasonably

15  believes that a suspect is about to draw a firearm and shoot the officer or another person, the

16  officer's decision to use deadly force on the suspect is not unreasonable."  *Garcia*, 2018 WL

17  1448744, at *4.  Given Officer Miller's observation of the gun just over an hour earlier, Taylor's

18  unmistakable movement of drawing a gun with his right arm gave an objectively reasonable officer

19  probable cause to use deadly force.

20        At the core of Plaintiffs' claims is the speculative and factually bereft argument that the

21  officers gave Taylor "conflicting commands" to show his hands or put his hands up and to get on

22  the ground.  From that factually unsupported proposition, Plaintiffs argue that Taylor was not

23  resisting arrest and drawing his gun but was instead confused and trying to comply with two

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 14
2:18-CV-00262

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

contradictory commands.  Besides lacking any evidentiary basis, this argument also fails, because Taylor's subjective intent or state of mind is not relevant to a Fourth Amendment analysis.  Rather, only the objective reasonableness of the officers' conduct, given the information they possessed at the time is material.  There is no evidence to dispute the officers' simultaneous observations that Taylor stopped complying with their commands and drew his firearm.  Further, Taylor *expressed no* confusion.  Instead, he said, "okay, okay, okay," appearing to any reasonable officer to understand they wanted him to surrender peacefully.  Taylor's sudden move of pulling his right arm up from his right hip would lead any reasonable officer to conclude that he no longer intended to surrender, and instead intended to draw his weapon and shoot.  This is true, even if Taylor was not in possession of a gun when he was shot, and the officers mistakenly believed he still was and thought he was drawing it.  The Court should dismiss the excessive force claim as a matter of law.

**C.      The Court Should Dismiss All Fourteenth Amendment Claims.**

Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct.  *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).

> Official conduct that "shocks the conscience" in depriving parents of that interest is cognizable as a violation of due process.  In determining whether excessive force shocks the conscience, the court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical."  Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience.  On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives.  For example, a purpose to harm might be found where an officer uses force to bully a suspect or "get even."

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 15
2:18-CV-00262

1    *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2013).

2          Here, as in *Wilkinson*, application of the purpose-to-harm standard is appropriate.   The

3    officers were forced to make a split-second decision to shoot Taylor in response to his sudden

4    movement of drawing his firearm.   There is no evidence that the officers acted with any intent to

5    harm unrelated to their legitimate law enforcement objectives of taking Taylor into custody safely.

6    **D.       The Individual Defendants Are Entitled to Qualified Immunity.**

7          Even if the Court found a genuine issue of material fact regarding the § 1983 claims against

8    the officers, they still may have qualified immunity.   Government officials enjoy qualified immunity

9    from civil damages unless their conduct violates "clearly established statutory or constitutional rights

10   of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

11   In deciding whether qualified immunity applies, the Court must determine: (1) whether the facts

12   alleged show the Defendants' conduct violated a constitutional right; and (2) whether that right was

13   clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36

14   (2009) (courts may address either prong first depending on the circumstances in the particular case).

15   A right is clearly established if the contours of the right are sufficiently clear that every reasonable

16   officer would understand that what he is doing violates that right.   *Ashcroft v. al-Kidd*, 131 S. Ct.

17   2074, 2083 (2011).   This requires some existing precedent to have placed the statutory or

18   constitutional question beyond debate.   *Id*.   The Supreme Court has "'repeatedly told courts—and

19   the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'"

20   *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *see also White v. Pauly*, 580 U.S. ___, 137 S. Ct.

21   548, 552 (2017).   The clearly established law must be "particularized" to the facts of the case.   *Pauly*,

22   137 S. Ct. at 552.   Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity

23

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 16
2:18-CV-00262

into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."

*Pauly*, 138 S. Ct. 552 (cites and ellipses omitted).

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.

*Kisela*, 138 S. Ct. at 1152–53 (citing *Mullenix v. Luna,* 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (*per curiam*) (internal quotation marks omitted).

Here, there is no clearly established law that would have told any objectively reasonable officer in Officers Spaulding and Miller's position that their actions were unconstitutional. Particularly, any reasonable officers faced with a known violent career armed felon, actively committing at least one felony, who was no longer showing any indication of complying with police commands, rejecting officers' clear directives to show hands or get on the ground, while reaching back with the same known bent elbow motion of unholstering and drawing a known firearm -- even ignoring directives up until the "hey no! hey no!" before the officers discharged their firearms would believe it was lawful to use deadly force to protect themselves. As set forth above, legal precedent at the time told every reasonable officer that deadly force was constitutional in these circumstances. The Court should grant qualified immunity to the defendant officers.

**E.    The Court Should Dismiss Plaintiffs' § 1983 Municipal Liability Claims.**

Plaintiffs claim the City is liable under § 1983, because the City's "customs and [*sic*] officers giving conflicting commands, decedent attempting to comply with the conflicting commands by putting his hands up in the air and then attempting to drop them to the ground, officers shooting decedent thereafter within seconds after approaching decedent meets the *Monell* claims as policy or

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

custom of giving conflicting commands and shooting and killing an individual within seconds is deficient, it caused great harm to the Plaintiffs, and it could be viewed that the policy/custom amounted to deliberate indifference."  (Dkt. #64, ¶ 2.6.)  Though difficult to decipher, Plaintiffs seem to allege the City has a custom and policy of giving inconsistent verbal commands to suspects, and then shooting those suspects.  This claim has no evidentiary support.

To succeed on a *Monell* claim, a plaintiff must establish that (1) the law enforcement officers acted under color of law; (2) the officers' actions deprived the plaintiff of his/her rights as afforded by the Constitution; and (3) the officers acted under an official policy or longstanding practice or custom. *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992). Because no constitutional violation occurred, Plaintiff's *Monell* claim fails as a matter of law. *Monell*, 436 U.S. at 692.  Absent a formal governmental policy, a plaintiff must show a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  An unconstitutional policy need not be formal or written to create municipal liability under § 1983; however, it must be so permanent and well settled as to constitute a custom or usage with the force of law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68, 90 S. Ct. 1598 (1970). There is no such evidence here.  Further, "[a] plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by an employee."  *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233-34 (9th Cir. 1989).  Plaintiffs' claim is based solely on this incident, and there is no evidence of any long-standing custom or policy of officers giving inconsistent commands.  To the extent he has any admissible opinions, Plaintiffs' own police practices expert has no opinions regarding the City's training.  The Court should dismiss this claim with prejudice as a matter of law.

**F.**    **The Estate of Brenda Taylor Has No viable Claim Against Defendants.**

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

Before her death, Brenda Taylor (Taylor's wife) was the Personal Representative of the Estate of Che Andre Taylor. Brenda Taylor's only claims against the Defendants were those in the shoes of the Estate. In fact, this Court dismissed the one asserted individual claim that Brenda Taylor had against Defendants. This Court dismissed Brenda Taylor's substantive due process claim with prejudice in an earlier order on Defendants' Motion to Dismiss the First Amended Complaint. (Dkt. 26, p. 11). Plaintiffs' Third Amended Complaint added the Estate of Brenda Taylor as a party. (Dkt. 62). However, the Third Amended Complaint does not plead any new or different claims of *individual* harm incurred by Brenda Taylor as a result of this underlying incident. (*Id.*).

The Estate of Brenda Taylor cannot bring actions otherwise recoverable by the Estate of Che Taylor. Likewise, the Estate of Brenda Taylor does not have a claim for substantive due process. (*Id.* at ¶ 5.6). The Ninth Circuit affords a substantive due process right for deprivation of companionship and society in a parent-child relationship. *Curnow By & Through Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir. 1991) (internal citations omitted). The right to assert this claim has not been extended to the marital relationship between husband and wife. *Allen v. Washington,* No. C05-5502KLS, 2006 WL 7132918, at *25 (W.D. Wash. 2006). As such, the Estate of Brenda Taylor's claim is barred and should be dismissed. (*See* Dkt. 6, ¶ 5.7) Brenda Taylor's death does not change her ability to bring a substantive due process claim for deprivation of companionship and society.

**G.    Plaintiff Minor Child C.T. Fails to Overcome Summary Judgment to Establish Companionship and Society Necessary for Her Substantive Due Process Claim.**

Plaintiff Minor C.T., through her mother, Sarah Settles brings a substantive due process claim for loss of a familial relationship with her biological father, Taylor. C.T. is three years old. (Sharifi Dec., ¶ 2, Exhibit 1, attachment) At the time of this underlying shooting, her mother, Sarah Settles was just over a month pregnant with C.T. (*Id.*) Sarah Settles was residing with the decedent

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 19
2:18-CV-00262

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

1   in a hotel room at a hotel called the Hawthorn Suites and also occasionally at her mother's home to

2   see her first child. (Sharifi Dec., ¶ 3, Exhibit 2, 8:7-25, 9:1-7).  Taylor was married to Brenda Taylor

3   at all relevant times of Ms. Settles' relationship with him. (*Id.* at 40:14-25; 41:1-4). Ms. Settles was

4   ████████████████████████████████████ with Taylor. (Muchmore Dec., ¶ 5; Sharifi

5   Dec. ¶ 4, Exhibit 3) Ms. Settles was also ████████████████████████████████

6   ██████████████. (*Id*). After Taylor's death, Ms. Settles acquired a court-order to have his blood

7   tested against that of C.T. to confirm paternity. (Sharifi Dec., ¶ 2, Exhibit 1, attachment; Sharifi

8   Dec., ¶ 3, Exhibit 2, 140:2-25). Paternity was confirmed. (*Id.*).

9         To overcome summary judgment on C.T.'s Fourteenth Amendment claim, Plaintiffs must

10   establish evidence to show an "enduring relationships reflecting an assumption of parental

11   responsibility [that] stem[s] from the emotional attachments that derive from the intimacy of daily

12   association, and from the role it plays in promoting a way of life through the instruction of

13   children." *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1058 (9th Cir. 2018) (citing *Lehr v.*

14   *Robertson,* 463 U.S. 248, 261-62, 103 S. Ct. 2985, 2993–94 (1983)) (alterations omitted). "The mere

15   existence of a biological link does not merit equivalent constitutional protection." *Lehr*, 463 U.S. at

16   261. In *Lehr*, the Court held that a biological father could not be afforded Fourteenth Amendment

17   protection of his relationship to his child where the evidence established that he failed to significantly

18   contribute to the child's custodial, personal, or financial relationship. *Id.* "[C]hildren's Fourteenth

19   Amendment rights to companionship with their parents have been interpreted as reciprocal to their

20   parents' rights." *Wheeler,* 894 F.3d at 1058. Plaintiffs cannot provide any evidence beyond

21   speculative hopes of Ms. Settles that Che Taylor was involved in any meaningful way in C.T.'s

22   future. In fact, the evidence suggests the contrary.  (*See* Sharifi Dec., Ex. 2). Taylor obviously never

23   met C.T. (Sharifi Dec., Ex. 1), Response to Request No. 3). Taylor was married at the time without

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 20
2:18-CV-00262

1    any proof of divorce. Taylor was ███████████████████████████████████

2    ████████████████████████████████████████████████, and did not show any

3    commitment to changing his relationship with the mother of his future child. (*See* Sharifi Dec., Ex.

4    3). "The importance of the familial relationship, to the individuals involved and to the society, stems

5    from the emotional attachments that derive from the intimacy of daily association, and from the role

6    it plays in 'promoting a way of life through the instruction of children as well as from the fact of

7    blood relationship." *Lehr*, 463 U.S. at 262 (citing *Smith v. Organization of Foster Families for

8    Equality and Reform,* 431 U.S. 816, 844, 97 S.Ct. 2094, 2109–2110 (1977)) (internal citations and

9    quotations omitted). Beyond speculation, Plaintiffs fail to provide any evidence that such a familial

10   bond existed or would exist. Plaintiffs cannot survive summary judgment on speculation alone.

11   *Emeldi v. Univ. of Oregon*, 673 F.3d 1218, 1233 (9th Cir.), *republished as amended at* 698 F.3d 715

12   (9th Cir. 2012). This Court should dismiss C.T.'s substantive due process claim.

13   **H.    The Court Should Dismiss Plaintiffs' Negligence Claim.**

14        Plaintiffs allege the officers breached their duties when they gave inconsistent commands

15   and "chose to shoot and kill Che Taylor." (Dkt. 64, ¶¶ 4.13, 5.1).  First, Plaintiffs' allegation that

16   officers shot Taylor cannot be supported in law as anything other than an intentional act for which

17   common law negligence does not apply. Second, Plaintiffs fail to overcome summary judgment due

18   to their failure to possess non-speculative evidence on the essential elements of breach and causation.

19        ***1.   No Negligence Claim for Intentional Act.***

20        It is well established in Washington that a plaintiff may not base a claim of negligence on an

21   intentional act. *See Willard v. City of* Everett, 2013 WL 4759064 at *2-*3 (W.D. Wash. Sept. 4,

22   2013). The decision to shoot Taylor can be nothing other than intentional and cannot be transformed

23

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 21
2:18-CV-00262

to expose Defendants to potential liability arising from negligence. *Ste. Michelle v. Robinson*, 52 Wn. Ap. 309, 314-16, 759 P.2d 467 (1988).

**2. There is No Negligence on the Part of the Officers and the Intentional Shooting Served as an Intervening Superseding Cause.**

i.   <u>Plaintiffs fail to establish breach and causation</u>.

Plaintiffs allege that Defendants breached a "duty they owe to <u>all citizens</u>, including Che Andre Taylor not to create a chaotic scene in which conflicting orders are given, confusing the decedent ..." (Dkt. 64, ¶4.13) (emphasis added). Even assuming such an alleged duty exists and is not otherwise barred by the public duty doctrine, Plaintiffs fail to establish breach. There is no evidence that commands were "conflicting." The commands were for Taylor to show his hands and get on the ground.  Neither command is confusing, and a suspect can easily comply with both at the same time. In fact, as the video shows, Taylor was initially complying with both commands without apparent difficulty, but then decided to stop complying and reach for his gun. Furthermore, there is no evidence other than pure conjecture on the part of Plaintiffs' counsel that Taylor was confused. As such, there is no evidence that Defendants breached such a duty. Likewise, Plaintiffs fail to establish causation. There is no evidence that that the commands *caused* Taylor's death. The evidence establishes that Taylor's complete shift of his body position, his reach for the weapon, and pivot from an initial impression of compliance resulted in the use of force. (*See* Spaulding Decl., Ex. A, p. 6; S. Miller Decl., Ex. A, p. 7.). It was those movements that caused the officers to shoot.  Any self-serving claim that Taylor somehow made those movements out of "confusion" is pure speculation.  It is also immaterial, as there can be no dispute that Taylor objectively reached for a gun, and the officers' use of force was in response to that deadly threat

ii.   <u>The intentional shooting was an intervening superseding cause</u>.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 22
2:18-CV-00262

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

As discussed, Plaintiffs must establish duty, breach, proximate causation, and damages. *Ranger Ins. Co. v. Pierce County*, 1164 Wn.2d. 545, 552, 192 P.3d 886 (2008).  However, if a defendant's acts were superseded by the action of the plaintiff or a third party as a matter of law, summary judgment may be granted for the defendant. *Kim v. Budget Rent A Car Systems, Inc.*, 143 Wash. 2d 190, 15 P.3d 1283 (2001), as amended, (Jan. 31, 2001). "A defendant's negligence is a proximate cause of the plaintiff's injury only if such negligence, unbroken by any new independent cause produces the injury complained of." *Schooley v. Pinch's Deli Mkt., Inc.,* 134 Wn.2d 468, 482, 951 P.2d 749, 756 (1998) (citing *Maltman v, Sauer,* 84 Wn.2d 975, 982, 530 P.2d 254 (1975)). A superseding cause is a new independent cause that breaks the chain of proximate causation between a defendant's negligence and an injury. *Schooley,* 134 Wn.2d at 756 (citing *State v. McAllister,* 60 Wn. App. 654, 660, 806 P.2d 772 (1991)).

Even assuming the commands were somehow conflicting, and the officers owed Plaintiffs a duty, the Plaintiffs still fail to establish proximate cause. The intentional shooting of Mr. Taylor is a superseding, intervening cause breaking the causal chain. There is no evidence that the allegedly conflicting orders were the proximate cause of the shooting.[9] Taylor initially complied with the orders, belying any claim he was confused, then reached for a gun, prompting the use of force. Plaintiffs fail to establish a causal connection between the "conflicting orders" and the damages

---

[9] To the extent Plaintiffs argue that the officers failed to follow their training and escalated the situation, that claim also fails.  In *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 540, 442 P.3d 608 (2019), the Washington Supreme Court held that there is a common law duty of reasonable care for law enforcement officers to refrain from causing foreseeable harm in interactions with others, which encompasses a duty to refrain from directly causing harm to another through affirmative acts of misfeasance.  *Id.* at 550.  The court held, "[t]he fact that [a police officer's] conduct may constitute assault and battery does not preclude a negligence claim premised on her alleged failure to use ordinary care to avoid unreasonably escalating the encounter to the use of deadly force."  *Id.* at 540.  There is no claim that the officers acted inconsistently with the training, and or that such a deviation caused the shooting.  It was Mr. Taylor's unmistakable movement of drawing a firearm that proximately caused the officers to shoot, not a failure to follow training.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 23
2:18-CV-00262

1    incurred from the intentional shooting of the decedent. This Court should dismiss Plaintiffs'

2    negligence claim with prejudice.

3

4    ### I.    The Court Should Dismiss Plaintiffs' Outrage Claim.

5          The tort of outrage (intentional infliction of emotional distress) requires the proof of three

6    elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional

7    distress, and (3) actual result to plaintiff of severe emotional distress.  *Kloepfel v. Bokor*, 149 Wn.2d

8    192, 195, 66 P.3d 630 (2003).  Claims for outrage must be predicated on behavior that is "so

9    outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,

10   and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Grimsby v.*

11   *Sampson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975) (internal citations omitted).  Whether the conduct

12   complained of is sufficiently extreme to result in liability is a preliminary question for the Court

13   before a claim of outrage can be allowed to go to the jury.  *Pettis v. State*, 98 Wn. App. 553, 563,

14   990 P.2d 453 (1999).  The officers used lawful force on Taylor and were not negligent.  There is no

15   basis for Plaintiffs' outrage claim, and the Court should dismiss it.

16   ### J.    The Court Should Dismiss Plaintiffs' Discrimination Claim.

17         Plaintiffs claim Defendants unlawfully discriminated against Taylor because of his race.

18   This claim is baseless.  The Washington Law Against Discrimination (WLAD) declares that each

19   person may be free from discrimination based on race, creed, color, national origin, and mental

20   disability. RCW 49.60.030. To show  race discrimination, a  plaintiff must show: (1) that he is a

21   member of a protected class; (2) the establishment is a place of public accommodation or

22   assemblage; (3) the defendant discriminated against the plaintiff by not treating him in a manner

23   comparable to the treatment it provides to persons outside that class; and (4) the protected status was

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 24
2:18-CV-00262

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

a substantial factor causing the discrimination.  *Demelash v. Ross Stores, Inc.*, 105 Wn. App. 508, 524-25, 20 P.3d 447, 456 (2001), *review denied*, 145 Wn.2d 1004 (2001).  Here, there is absolutely no evidence to support the third or fourth elements of a racial discrimination claim.  Officers Spaulding and Miller attempted to arrest Taylor because he was a felon in possession of a firearm. They shot Taylor, because he posed an imminent threat of death or serious bodily harm.

**K.      Plaintiff's State Law Claims Are Barred by RCW 4.24.420.**

RCW 4.24.420 provides that it is a "complete defense to any [state law] action for damages for personal injury or wrongful death that the person injured or killed was engaged in the commission of a felony at the time of the occurrence causing the injury or death and the felony was a proximate cause of the injury or death."  When Taylor drew his gun, he was not only committing the felony crime of possessing a firearm, he was also assaulting the officers with a firearm, also a felony offense.  RCW 9A.36.011.  Because that felony offense caused the use of deadly force on Taylor, Plaintiffs' causes of action under Washington law are barred.

## IV.  <u>CONCLUSION</u>

This Court should grant Defendants' Motion for Summary Judgment and dismiss Plaintiffs' case with prejudice.

DATED this 2nd day of April, 2020.

CHRISTIE LAW GROUP, PLLC

By _____*/s/ Thomas P. Miller*_____
       THOMAS P. MILLER, WSBA #34473
       2100 Westlake Avenue N., Suite 206
       Seattle, WA 98109
       Phone: 206-957-9669
       Email: tom@christielawgroup.com
       Attorney for Defendants

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

PETER S. HOLMES
Seattle City Attorney

By _____ /s/ Ghazal Sharifi _____
    GHAZAL SHARIFI, WSBA #47750
    SUSAN PARK, WSBA #53857
    Assistant City Attorneys
    701 Fifth Avenue, Suite 2050
    Seattle, WA 98104-7095
    Email: Ghazal.Sharifi@seattle.gov
    Email: Susan.Park@seattle.gov
    Attorneys for Defendants

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 26
2:18-CV-00262

1

**CERTIFICATE OF SERVICE**

2      I certify that on April 2, 2020, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to:

3

4      James Bible, Esq., WSBA# 33985
       James Bible Law Group
       14205 SE 36th Street, Suite 100
5      Bellevue, WA 98006
       *[Attorney for Plaintiffs]*

6

       Shakespear N. Feyissa, Esq., WSBA# 33747
7      Law Offices of Shakespear N. Feyissa
       1001 4th Avenue, Suite 3200
8      Seattle, WA 98154
       *[Attorney for Plaintiffs]*

9

       Jesse Valdez, Esq. WSBA# 35278
10     Valdez Lehman, PLLC
       600 108th Ave., NE, Suite 347
11     Bellevue, WA 98004-5101
       *[Attorney for Plaintiffs]*

12

13

            _s/ Jennifer Litfin_
14          Jennifer Litfin, Legal Assistant

15

16

17

18

19

20

21

22

23

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 27
2:18-CV-00262