HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

DEVITTA BRISCOE, individually, and as
executor of the Estate of Che Andre Taylor;
JOYCE DORSEY, individually; CHE ANDRE
TAYLOR, JR., individually; and SARAH
SETTLES on behalf of her minor child, C.M.T,
and DEMEKA GREEN for the Estate of
Brenda Taylor,

                                    Plaintiff,

        vs.

CITY OF SEATTLE; MICHAEL
SPAULDING and "JANE DOE"
SPAULDING, and their marital community
composed thereof; SCOTT MILLER and
"JANE DOE" MILLER, and their marital
community composed thereof; TIMOTHY
BARNES and "JANE DOE" BARNES, and
their marital community composed thereof; and
AUDI ACUESTA and "JANE DOE"
ACUESTA, and their marital community
composed thereof,

                                    Defendants.

No.    2:18-CV-000262-TSZ

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
REQUEST FOR ORAL ARGUMENT**

        Nobody likes a game of "he said, she said," but far worse is the game of "we said, he's dead."

Sadly, this is too often what we face in police shooting cases like this one.    *See Cruz v. City of*

*Anaheim,* 765 F.3d 1076 (2014).

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 1

**VALDEZ LEHMAN, PLLC**
14205 SE 36ᵗʰ St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

## STATEMENT OF FACTS

**The Shooting**

On February 21, 2016, at approximately 4:15 p.m. Che Andre Taylor was shot to death by Seattle Police Officer's Miller and Spaulding while attempting to comply with the conflicting commands of four different officers that were yelling at him from different directions and varying distances. *See Dec. of Jesse Valdez, EX. A Dashcam video of killing of Che Taylor time 18:23-18:35.* At the time officers were yelling their commands, each had their firearm trained on Che Taylor. *Id.* Officer's Spaulding and Miller were in under cover clothing when they approached Che Taylor with their long guns pointed them at him. *Id.* Any indication that Spaulding and Miller were police officers was obscured by their arms, hands and weapons that they were pointing at Che Taylor. *Id..* The marked police car that arrived at the scene had audio and video of the critical portions of this incident. *Id.* Che Taylor can clearly be seen raising his hands when instructed and going to the ground as instructed in an attempt to comply with the four officers that were yelling the varying commands at him at or near the same time. *Id. at 18:27-18:35,* Che Taylor did not point a firearm at any officer or person on the date in question. *Id.* Further, Che Taylor did not attempt to point a firearm at any person or officer on the date in question. *Id.* Indeed, the plaintiffs contest whether Che Taylor was ever even in possession on firearm on the date at issue. *Id. at 0:00- 18:35.*

It is notable that the gun that was found in the vehicle that did not belong to Che Taylor was registered to a former King County Sheriff. *See Declaration of Jesse Valdez, EX. B Email and Statement from Dan Murphy.* Further, photographs of the gun in the car under the passenger seat show that there was foam from the seat cushions on the gun at the time that the photographs were taken. *See Declaration of Jesse Valdez, EX. C. Photos of Gun.* The foam logically was from the officer's bullets that went through the seat during this incident. *Id.*

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 2

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

**Events Leading Up to the Shooting**

Earlier in the day on 4/21/16, officers Miller and Spaulding were observing a residence in their undercover capacity. *See Defendant's Motion for Summary Judgment page 2 lines 5-10.* They were in an unmarked SUV with tinted windows. *Id.* The vehicle was not readily recognizable as police vehicle. *Id.* Miller and Spaulding were also wearing civilian clothes rather than law enforcement uniforms. *Supra EX A at 18:22-18:35.* At some point during their undercover observation, officers claim to have seen Che Taylor get out of a Dodge Magnum near the residence that they were surveilling and then go into the residence at issue. *See Dec. of Jesse Valdez, EX. D Dep. of Spaulding p. 88 lines 16-25.* According to officers, they were approximately 20 yards from Che Taylor at the time that he got out of the Magnum. *Id.* Officer Miller claims to have briefly seen a gun in a holster on Che Taylor's person at the time that Che Taylor got out of the Dodge Magnum and headed to the apartment complex. *Id.* The officers did not stop Che at the time one of them claimed to have seen a weapon. Instead, they allowed Che to go into the apartment complex at issue and lost sight of him. *See Dec. of Jesse Valdez, EX. E Dep. of Miller*, p. 102 lines 14-25; *Dep. of Spaulding, p. 62, lines 6-13.* A significant period of time later, Officers Miller and Spaulding saw Che Taylor as a passenger in a white vehicle that pulled up in front of the residence that they were surveilling. *Id.* The officers did not ever see Che Taylor leave the apartment complex. *Id.* How Che Taylor got into the white vehicle remains unexplained. The officers did not see a gun in Che Taylor's hand or on his person at the time that the officers Spaulding and Miller approached and shot him repeatedly. *Supra Exhibit A at 18:22-18:35.*

**Inconsistent and Contradictory Commands were Yelled From Four Different Officers At The Same Time To Mr. Taylor**

Whether the police officers had an arrest plan is subject to debate. Officer Miller does not recall whether he even discussed having an arrest plan for Che Taylor with Officer Spaulding. *See*

*Dec. of Jesse Valdez EX F. Dep. of Miller p. 99, lines 19-23.* Officer Spaulding claims that he discussed a few arrest plans with Officer Miller. *Dec. of Jesse Valdez EX G. Dep. of Spaulding, p. 60, lines 15-25.* Officer Miller claims he understood that they were sticking to the original arrest plan for Che Taylor. *See Dec. of Jesse Valdez, EX. H Dep. of Miller, p. 108, lines 2-11.* Officer Spaulding claims they changed the arrest plan for Che Taylor. *Dec. of Jesse Valdez EX I. Dep. of Spaulding, p. 61-62, lines 17-13.* Officer Miller thought they would be sticking to the original plan and that they would be contacting Che Taylor and officers Barnes and Acuesta would assist with the arrest. *Dec. of Jesse Valdez EX J. Dep of Miller, p. 108, lines 7-11.* Based upon the video, it appears that they did not have any actual arrest plan and no actual assigned roles. *See Declaration of Jesse Valdez, EX. A. 18:15-18:35.*

What was clear is that four officers were yelling inconsistent and contradictory commands at Che Taylor while pointing firearms at him. *Id.* Two of the officers were in plain clothes and had come out of an undercover vehicle at a brisk pace with guns pointed at Che. *Id.* At the time that the officers were running at Che Taylor with weapons in their hands, Che was standing in the door jam of the front passenger cabin of the white vehicle. *Id.* Officers were yelling hands up and get on the ground. *Id.* Contrary to what the officers claim, they did not have a conversation with Che Taylor and they did NOT announce themselves as police officers. *Id.* Che Taylor clearly was complying with these inconsistent and contradictory commands when he was shot and killed. *Id.* At least one Seattle Police Department Training Manual contains a section that indicates that officers should not use inconsistent and contradictory commands such as put your hands up and get on the ground prior to the use of force. That manual specifically states the following:

> It is of utmost importance that only one officer provides commands so that communication with the subject is **not contradictory**…An example of this might be

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 4

**VALDEZ LEHMAN, PLLC**
14205 SE 36ᵗʰ St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

when the cover officer is shouting **to the subject to raise his hands while the TASER officer is ordering to lie on the ground.**

*See Dec. of Jesse Valdez Exhibit K. City of Seattle Police Department Instructional Systems Design Manual on Tasers X2 page 31.*

Clearly, if it is of the utmost importance that only one officer provides commands so that communication with the subject is not contradictory in less lethal force scenarios, it is of great importance that commands be consistent when lethal force is a possibility that the officer is entertaining.  It is remarkable that the example cited in the manual is the same as the commands made in the present case.  *Id.*  Nonetheless, the officers attempted to downplay the need for consistent commands and not having more than one officer yell out commands during their depositions.  *See Dec. of Jesse Valdez EX. L Dep. of Barnes, p. 14, lines 8-25, Dep. of Acuesta p. 29-31, lines 10-12, Dep. of Scott Miller, p. 183-184, lines 25-16, Dep. of Spaulding p. 20, lines 3-21.*

**The Officers Current Claims Do NOT Match Video Evidence Or Prior Statements**

The after the fact claims of the officers via their depositions and declaration related to this motion are inconsistent with the in-car dash video and incident reports.  *See Declaration of Jesse Valdez, EX. A at 18:15-18:40.*   While the officers claim to have had a conversation with Che Taylor prior to shooting him, the in-car dash camera and recorder did not record that conversation.  *Id.*  The video accurately depicts and represents what occurred prior to and after the shooting.  *Id.*  Further, the officer's statements to detectives close in time after the shooting death are inconsistent with the officers new assertions in their declarations and depositions.  In response to questioning by Detective Corbin, Officer Miller indicated the following:

Detective Corbin: *"Okay. Uh, where was your badge?"*
Officer Miller: **"Uh, my physical badge was hanging around my neck underneath my jacket."**
Detective Corbin: *"Did the subject acknowledge that you were a police officer?"*
Officer Miller: **"He did not verbally acknowledge that we were the police, no."**

A police officer's uniform and a police officer's badge is their most important and obvious representation to the general public that they are in fact police officers empowered to make arrests. While Officers Miller and Spaulding claim they were wearing some clothing and equipment with visual representations which identified them as police officers, Officer Miller admitted to Detective Corbin in his interview transcript that his **badge was concealed under his jacket** and that **Taylor never acknowledged him or Spaulding as police officers.**

*See Dec. of Professor Gregory Gilbertson, EX. B, page 8-9, para. 41-42.*

The video evidence clearly contradicts the claims of the officers as well. *See Dec. of Jesse Valdez, EX. A at 18:15-18:40.* Clearly, the plaintiffs dispute any claim that Che Taylor was reaching for a gun or was even in possession of a gun at the time that the officers approached him and shot him. Further, based upon the evidence, the plaintiffs dispute the claim that Che Taylor attempted to dive into the white vehicle. *Id.* It is notable that the officer instructed him to raise his hands and get on the ground at while he was standing in the doorway of the vehicle. *Id.* The officers did not instruct him to step back. *Id.* Because he was close to the vehicle at the time that he was shot portions of his body may have fallen into the vehicle. *Id.* Interestingly, there were two passengers inside the vehicle. *Id.* Both of the individuals inside the vehicle were commanded to step backwards toward the officers as opposed to being told to put their hands up and get on the ground right next to the car. *See Dec. of Jesse Valdez Exhibit A at* 18:15-20:20 *Id.* While Che Taylor is African American, the two other individuals in the car were white. *Id.* A white female did not comply with SPD officers' commands. *Id.*

**Che Taylor And His Daughter**

Regardless of his circumstances, Che Taylor has always maintained a relationship with his children. He has a son, a stepdaughter and now he has a biological daughter. Because, he was shot and killed prior to her birth, Che's lost the love and companionship of her biological father. She will never hear him say I love you or spend time with him.

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

## LEGAL AUTHORITY AND ANALYSIS

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The movant bears the initial burden to demonstrate that absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  A genuine dispute over a material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-movant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986).  On a motion for summary judgment "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*  at 255.  In determining whether the factfinder could reasonably find in the non-moving party's favor, "the court must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

## Section 1983 and Probable Cause and Plaintiffs Fourth Amendment Claim.

Use of excessive force to accomplish an arrest, even where supported by probable cause and/or a warrant, clearly violates the Fourth Amendment. *See Graham,* 490 U.S. at 388, 109 S.Ct. 1865; *Palmer v. Sanderson,* 9 F.3d 1433, 1436 (9th Cir.1993).  Probable cause is a mixed question of law and fact: the jury makes a determination about underlying facts if there are material disputes of fact; if there are no material disputes of fact then the court makes the determination whether probable cause existed. *See Dubner v. City & County of San Francisco,* 266 F.3d 959, 965 (9th Cir. 2001); *McKenzie v. Lamb,* 738 F.2d 1005, 1007–08 (9th Cir. 1984.   In the present case, the plaintiff's dispute whether the defendants had probable cause sufficient to justify their actions.  First, it is disputed that Officer Miller ever saw a gun in Mr. Taylor's possession.   Second, if Officer Miller did see something that appeared to be a firearm in Mr. Talyor's possession earlier in the day, it does not

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 7

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

1   justify stopping Che Taylor a significant period of time later after having lost visual contact with Mr.

2   Taylor for a significant period of time.  Third, at the time of the actual approach and arrest of Mr.

3   Taylor, the officer did not see a fire arm in Mr. Taylor's possession. Additionally, because a

4   significant amount of time passed, Plaintiffs believe probable cause was stall.  *See Dec. of Gregory*

5   *Gilbertson.*  Given that probable cause is in dispute, a jury must make factual determination in this

6   case, and the Court should allow the false arrest claim/s to proceed.

7   **Excessive Force**

        Under the Fourth Amendment claim, the amount of force used must be "objectively

8   reasonable under the circumstances."  *See Drummond ex. rel. Drummond v. City of Anaheim,* 343

9   F.3d 1052, 1056 (9th Cir. 2003) (*citing Graham v. Conner,* 490 U.S. 386, 397, 109 S. Ct. 1865, 104

10  L.Ed. 2d 443 (1989).

11          This analysis involves three steps.   First the Court must assess the severity of the intrusion on

12  the individual's Fourth Amendment rights, by evaluating 'the type and amount of force inflicted."

13  *See Espinosa,* 598 F.3d at 537 (quoting *Miller v. Clark Cnty.,* 340 F.3d 959, 964, (9th Cir. 2003)).

14  "[E]ven where some force is justified, the amount actually used may be excessive."  *See Santos,* 287

15  F.3d at 853.  Second, the court evaluates the government's interest in the use of force.  *Graham,* 490

16  U.S. at 396, 109 S. Ct. 1865.  Finally, the court must "balance the gravity of the intrusion on the

17  individual against the government's need for that intrusion."  *Miller,* 340 F.3d at 964.  These factors,

18  however, are not exclusive.  *See Bryan v. MacPherson,* 630 F.3d 805, 826, (9th Cir. 2010).  We

19  "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate

20  in a particular case, whether or not listed *Graham'" Id.* (*quoting Franklin v. Foxworth,* 31 F.3d 873,

21  876 (9th Cir. 1994)).  Other relevant factors include the availability of less intrusive alternatives to the

22  force employed, whether proper warnings were given and whether it should have been apparent to

23

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 8

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

officers that the person they used force against was emotionally disturbed.  *See e.g. Bryan,* 630 F.3d at 831, *Deorle,* 272 F.3d at 1282-83.

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *See Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir.) (en banc ), *cert. denied*, 545 U.S. 1128, 125 S.Ct. 2938, 162 L.Ed.2d 866 (2005) (first alteration in original); *see Glenn v. Wash. Cty*., 673 F.3d 864, 871 (9th Cir. 2011). "This principle applies with particular force where," as here, "the only witness other than the officers was killed during the encounter." *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir.) (*en banc ), cert. denied*, ––– U.S. ––––, 135 S.Ct. 676, 190 L.Ed.2d 389 (2014). "In such cases, we must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story ... is unable to testify." Id. (internal quotation marks omitted).  "Accordingly, we carefully examine all evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence ... to determine whether the officer's story is internally inconsistent with other known facts." *Id.* (internal quotation marks omitted); *See, e.g., Cruz v. City of Anaheim*, 765 F.3d 1076, 1079-80 (9th Cir. 2014) (fact that no gun was found on decedent cast doubt on officers' account that decedent reached for waistband such that "jury could ... reasonably conclude that the officers lied") (internal quotation marks omitted).  *See Wallisa v. City of Hesparia*, 369 F.Supp.3d 990 (C.D. Cal., 2019)(Court denied Defendants Motion for Summary Judgment and Qualified Immunity as there was issues of facts as a reasonable jury could conclude Plaintiff was not an immediate threat and officers used excessive force.)

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

**SPD officers, including but not limited to Office Scott Miller, Spaulding, Acuesta and Barnes, were acting under color of state law when he used excessive force on Che Andre Taylor**

The language of § 1983 as originally passed is as follows:

[A]*ny person who,* under color of any law, statute, ordinance, regulation, custom or usage of any State, *shall subject, or cause to be subjected*, any person…to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statue, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress…(emphasis added).

*Monell v. New York City Dept. of Social Services,* 436 U.S. 665, 691-92 (1978).  Under

"color" of law means under the "pretense" of law.  *Screws v. U.S.,* 325 U.S. 91, 111 (1945) (police

officers acting under color of law because authorized to act, even though not authorized to use

excessive force.)  Acts of police officers who undertake to perform their official duties are included

whether they hew to the line of their authority or overstep it.  If, as suggested, the statute was

designed to embrace only action, which the government in fact authorized, the words "under color of

any law" were hardly apt words to express the idea.  *Screws,* 325 U.S. at 111.  Section 1983 "is not

itself a source of substantive rights," but merely provides "a method for vindicating federal rights

elsewhere conferred."  *Graham v. Conner,* 490 U.S. 38, 393-394 (citing *Baker v. McCollan,* 443 U.S.

137, 144, n. 3 (1979).  The use of force by a law enforcement officer violates the Fourth Amendment

if the force is unreasonable given all the "relevant circumstances." *Hammer v. Gross,* 932 F.2d 842,

846 (9th Cir. 1991).  The use of deadly force, in particular, "implicates the highest level of Fourth

Amendment interests."  *A.K.H. ex. rel. Landeros v. City of Tustin,* 837 1005, 1011 (9th Cir. 2016).

**Deadly Force**

In the deadly force context, **courts cannot "simply accept what may be a self-serving**

**account by the police officer**." (Emphasis Added) *See Cruz v. City of Anaheim,* 765 F.3d 1076, 1079

(9th Cir. 2014) *citing Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994).  Because the person most

likely to rebut the officers' version of events — the one killed — can't testify, "[t]he judge must

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 10

VALDEZ LEHMAN, PLLC
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

carefully examine all the evidence in the record ... to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.; see also Gonzalez v. City of Anaheim,* 747 F.3d 789, 794-95 (9th Cir.2014) (en banc). This includes "circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Scott,* 39 F.3d at 915.  In *Cruz v. City of Anaheim*, 765 F.3d 1076 (2014), an informant told police officer Nathan Stauber that Caesar Cruz was a gang member who sold methamphetamine and carried a gun.  *Id.* at 1077.  Later the informant told Stauber where Cruz was, what his vehicle looked like and that he was armed with a nine-millimeter. *Id.* at 1078.  That informant also reported that Cruz was carrying the gun in his waistband and had made it clear that "he was not going back to prison."  *Id.*  Stauber relayed this message to other officers and they converged on Cruz's location with multiple police vehicles, both marked and unmarked.  *Id.*  Cruz had a broken taillight so they executed a traffic stop.  *Id.  C*ruz pulled into a Walmart parking lot, and police surrounded him with their vehicles.  *Id.*  Cruz attempted to escape, backing his SUV into one of the marked partial cars in the process.  *Id.*  Cruz eventually stopped, and the officers got out of their vehicles with weapons drawn.  *Id.*  Cruz opened his door, and the police shouted at him to get on the ground as he was emerging from the vehicle.  *Id.*   According to four of the officers, he ignored their commands and instead reached for the waistband of his pants.  *Id.* Fearing that he was reaching for a gun, all five officers opened fire.  *Id.*  They fired about twenty shots in two to three seconds.  *Id.*  A bystander, Norman Harms, witnessed most of the event from the other side of Cruz's vehicle, but he could only see Cruz's feet and the top of his head at the time of the shooting, so he didn't see whether Cruz reached for his waistband.  *Id.*  After they ceased firing, the officers approached Cruz's body to find it tangled in his seat belt and hanging from it.  *Id.*  After they cut the body loose, they found no weapon on it, but a loaded nine-millimeter was later recovered from the passenger seat.  *Id.*  The district court granted summary judgment to defendants on all

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 11

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

claims, finding that Cruz's decedents hadn't presented anything to contest the officers' version of events.  *Id.*  The Ninth Circuit Court of Appeals held that the district court erred in ruling that only an unreasonable or speculation jury could disbelieve the four officer's version of events and reversed and remanded the case back to the district court.  *Id.* at 1080-81.  The court reversed the district court's decision as to Monell as well to certain defendants.  *Id.*   The district court wrongly believed the question it was posed with was a one simple question: Did the police see Cruz reach for his waistband?  *Id.* at 1079.  If they did, they were entitled to shoot; if they didn't, they weren't.  *Id.*

However, the 9th Circuit Court of Appeals correctly restated the question posed for a judge ruling on the officers' motion for summary judgment, this translates to a different question: "**Could any reasonable jury find it more likely than not that Cruz *didn't* reach for his waistband?"** *Id.* *(Emphasis Added).*  The Court held, in this case, there's circumstantial evidence that could give a reasonable jury pause.  *Id.* The court stated, the most obvious is the fact that Cruz didn't have a gun on him, so why would he have reached for his waistband?  *Id.*   Cruz making a gesture of reaching for his gun when no gun is there makes no sense whatsoever.  *Id.*   A jury may doubt that Cruz did this. *Id.*  A jury can also reasonably conclude that the officers lied.  *Id.* at 1080.

A jury might find implausible other aspects of the officers' story.  *Id.*   For starters, *four* of the officers said they saw Cruz reach for his waistband.  *Id.*   A jury might be skeptical that four pairs of eyes had a line of sight to Cruz's hand as he stood between the open car door and the SUV.  *Id.* A reasonable jury could doubt that Cruz would have reached for a non-existent weapon with his off hand.  *Id.*  But it's also possible that the officers didn't wait for Cruz to exit his car — or reach for his waistband — and simply opened fire on a man who was trying to comply with their instructions to "[g]et down on the ground."  *Id.*  The testimony of the only non-police eyewitness, Norman Harms, indicates that Cruz's feet indeed made it out of the car, but that Cruz was "slipping on the ground, like

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 12

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

kind of falling down," as if he were "tripping."  *Id.*   This paints a different picture than the officers'

testimony that Cruz had fully emerged from his SUV and was poised to attack.  *Id.*

Based on Harms's testimony, a jury might find that Cruz was trying to get out of the car (as he was

ordered to do multiple times after he opened his door) but got caught in his seat belt.  *Id.*  Were a jury

to believe this version of events — which seems no less likely than a man shot while standing next to

a vehicle becoming suspended by a seat belt — this would certainly cast doubt on the officers'

credibility  and  lead  the  jury  to  find  for  plaintiffs.  *Id.*   The  court  further  held,  we  make  no

determination about the officers' credibility, because that's not our decision to make.  *Id.*  We leave it

to the jury.  *Id.*

This case is similar to *Cruz v. City of Anaheim,* as there is circumstantial evidence that could

give a reasonable jury to pause.  The same rationale in *Cruz v. City of Anaheim* applies here.  First,

the most obvious is the fact, similar to Cruz, Che Andre Taylor didn't have a gun on him, so why

would he have reached for this waistband/ hip?  Like Cruz, Che Andre Taylor making a gesture of

reaching for his gun when no gun is there makes no sense whatsoever.  A jury may doubt that Che

Andre Taylor did this at all.  Finally, a jury can also reasonably conclude that the officers lied.  This

court should not simply accept what may be a self-serving account by the police officers.  A jury may

be skeptical that some officers had an allegedly conversation with Che Andre Taylor and could

reasonably believe that officers were giving Che Andre Taylor conflicting and contradictory

commands.  Lastly, a jury could reasonably believe that Che Andre Taylor was attempting to comply

with the officers commands - It's possible that the officers didn't wait for Che Andre Taylor to reach

for his waistband — and simply opened fire on a man who was trying to comply with their

instructions to "get on the ground" and "put your hands up."  **The video raises numerous questions**

**of facts and certainly cast doubt on the officers' credibility and can lead to the jury to find for**

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 13

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

**the plaintiffs.**  Defendants argue there is no testimony to even suggest that Che Andre Taylor was complying with commands and the reason is because Che Andre Taylor the person most likely to rebut the officers' version of events –was shot and is dead – he can't testify.   This court should rule similar to *Cruz v. City of Anaheim,* in which the Court held that there is circumstantial evidence that could give a reasonable jury to pause, and deny summary judgment and leave the decision to the jury to decide.

**Qualified Immunity**

In evaluating qualified immunity, courts ask two questions: (1) whether, taking the facts in the light most favorable to the nonmoving party, the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct.  *See Saucier v. Katz,* 533 U.S. 194, 200-01, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001) *overruled in part by Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

Under the Fourth Amendment, the amount of force used must be "objectively reasonable under the circumstances."  *See also Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052, 1056 (9th Cir. 2003)(*citing Graham v. Conner,* 490 U.S.  386, 396 (1989)); *See Cruz v. City of Anaheim,* 765 F.3d 1076, 1079 (9th Cir. 2014) n. 3(In the usual case, we review the record "from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham v. Conner,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d. 443 (1989); *Wilkinson v. Torres,* 610 F.3d 546, 551 (9th Cir. 2010)(explaining that "the critical inquiry is what [the officer] perceived").  So that fact that Cruz did not have a gun on him normally wouldn't factor into the reasonableness analysis because the officers couldn't know what was (or wasn't) underneath Cruz' waistband.  But, because the officers killed Cruz, we must examine whether the officers accounts are "consistent with other known facts." *Scott,* 39 F.3d at 915.  One of those facts is that no gun was found on Cruz

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 14

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

(though a gun was found – with safety on – on the passenger's seat.)  Because the excessive force inquire ordinarily "requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has emphasized that "summary judgment…in excessive force cases should be granted sparingly."  *See Smith v. City of Hemet,* 394 F.3d 689, 701 (9th Cir. 2005)(en banc.)

At the time of the shooting, it was clearly established that officers may not use deadly force against a person who is armed but cannot be reasonably be perceived to be taking any furtive, harrowing, or threatening actions.  *See George v Morris, 736 F.3d 829, 838 (9th Cir. 2013).*  This is true in which the suspect has allegedly "committed a violent crime in the immediate past."  *See Harris v. Roderick, 126 F.3d 1189, 1203-04 (9th Cir. 1997); See also N.E.M. et. al. v. City of Salinas 5:14-cv-05598 (9th Cir Court of Appeals 2019)(Court affirmed district Court that denied Defendants Motion for Summary Judgment and officers request for qualified immunity as it must view all facts in favor of the non-moving party.)*

This Court must analyze whether the Defendants are entitled to qualified immunity based on whether any reasonable jury could find it more likely than not that Che Andre Taylor didn't reach for his waistband/hip?  Again, in the deadly force context, courts cannot simply accept what may be a self-serving account by the police officers as set forth above.  In this case, when viewed in the context of the totality of circumstances confronting the SPD officers, including but not limited Mr. Spaulding and Mr. Miller including all information available at the times and circumstantial evidence, if believed, would tend to discredit the Defendants theory.  It is disputed whether Che Taylor posed an immediate threat to the safety of the officers or others.  The officers clearly did not believe that he was an immediate threat to others at the time that they observed him walk into the apartment complex.  If they did believe that he was an immediate threat, they likely would have tried to arrest him earlier when they initially saw him.  Further, the objective video and audio recorded

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 15

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

evidence clearly suggests that Che Taylor was following commands at the time he was shot.  Because Che was following their commands, the officers cannot reasonably perceive him as threatening them.

Plaintiffs further dispute that Che Andre Taylor took any action that could be deemed resisting arrest or attempting to flee from SPD officers.    There is no evidence in the record that shows or suggest an actual, immediate threat to anyone in particular from an objective perspective. *See Deorle v. Rutherford,* 272 F.3d 1272, 1281 (9th Cir. 2001)("[A] simple statement by an officer that he fears for his safety or safety of others is not enough; there must be objective factors to justify such a concern.").  Again, Che Taylor was shot and killed while complying with the conflicting and contradictory commands of the officers.  Officers shooting someone who is following officer instructions and commands is textbook excessive force.   The officers in this case had fair warning that their use force violated Che Taylor's Fourth Amendment rights, they are not entitled to qualified immunity.  Thus, they fail the first prong of qualified immunity.  Defendants fail the second prong of qualified immunity because it was clearly established that  shooting and killing Che Andre Taylor was excessive, and  therefore unconstitutional, and Che Andre Taylor's right was clearly established at the time of the challenged conduct, such that SPD officers, including but not limited to Mr. Miller and Mr. Spaulding, would have understood that what they were doing violates that right.  Che Taylor was the second person over the span of a three-year period that Officer Spaulding had been involved in shooting and killing.

**Court Should Allow Plaintiff's Fourth and Fourteenth Amendment Claims/Tort of Outrage**
For the reasons set forth above, the Court should allow the Plaintiff's Fourth and Fourteenth Amendment claims under 42 U.S.C. § 1983.  For the reasons set forth in the excessive force claim, Plaintiffs defers to that analysis as it is similar analysis required for the Plaintiff's claim of outrage and assault.  Thus, Plaintiff's claim and analysis for outrage and assault is same which was used for

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 16

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

the excessive force claim.  Officers jumped out of an unmarked vehicle and shot Che Taylor repeatedly while he was following their commands.

**Negligence**

In all negligence actions the plaintiff must prove the defendant owed the plaintiff a duty of care.  *See Washburn v. City of Federal Way*, 169 Wash. App. 588, 610, 293 P.3d 567 (2012). Whether the duty is owed is question of law.  Id at 610.  But duty arises from the facts presented.  *Id.* 610.  To determine whether a defendant owes a duty to the plaintiff, appellate courts have frequently reviewed ***whether sufficient evidence supports*** a finding that the alleged duty was owed in the particular circumstances of the case.  *Id* at 610, 611.  ***Thus, a challenge to whether the defendant owes a duty to a plaintiff sometimes requires a determination whether facts can be proved that give rise to the alleged duty, and in such cases, the issue of duty does not present a pure question of law appropriate for summary judgment***.  Id at 611. (Emphasis added).  Washington courts have held in negligence cases that they look at the result of the direct contact of the officer with the individual, not the performance of a general public duty.  *See Garnett v. City of Bellevue,* 59 Wn. App. 281, 286 796 P.2d 782 (1990).  In order to state a cause of action for negligence, it is necessary to allege facts which would warrant a finding that the defendant has committed an unintentional breach of a legal duty, and that such breach was a proximate cause of the harm.  *See O'Donohue v. Riggs,* 73 Wash. 2d. 814, 440 P.2d 823 (1968)(Plaintiff can establish use of force claim upon showing that someone unintentionally but carelessly used excessive force).  In Washington, the public duty doctrine defines the four instances under which a governmental entity may be found to owe a statutory or common law duty to a particular member of the public, namely…(iv) a special relationship. *See Cummins v. Lewis County,* 156 Wash.2d 844, 853 & n. 7, 133 P.3d 458 (2006).   Under this exception, "special relationship", a plaintiff may establish the presence of "a duty owed to the injured person as an

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 17

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

individual" by showing "that a 'special relationship' exists between the plaintiff and the governmental body." *Torres v. City of Anacortes*, 97 Wash. App. At 73-74, 981 P.2d 891 (1999).  In addition, as with the other exceptions, this "special relationship inquiry' acts as "a 'focusing tool' used to ensure that the duty asserted is specifically focused on the claimant and is not merely a general duty to the public at large." Id. at 74, 981 P.2d 891.  Police officers have a common law duty to avoid the foreseeable consequences of their actions.  "The distinction between mandated duties and common law duties is important because duties imposed by common law are owed to all those foreseeably harmed by the breach of the duty."  *Munich v. Skagit Emergency Commc'rn Ctr.,* 175 Wn. 2d 871, 891, 288 P.3d 328 (2012).  Harm is foreseeable when the hazard or injury at issue is well within the general filed of danger covered by the duty.  *McKown v. Simon Prop. Grp., Inc.,* 182 Wn.2d 752 (2015).  The general rule is that "[f]orseeability is normally an issue of the trier of fact and will be decided as a matter of law only where reasonable minds cannot differ."  *Schooley v. Pinch's Deli Mkt., Inc.,* 134 Wash.2d 468 (1998).    Specifically, the common law duty the officers owed to Che Taylor was duty to act without negligence once they chose to take affirmative action to arrest Che Taylor.  Where government officers act, it must avoid misfeasance.  "Under common law, a defendant owes a plaintiff the duty to exercise reasonable care if (1) the defendant, by act or misfeasance, poses a risk of harm to the plaintiff, as where the defendant actively creates or increases peril and exposes the plaintiff to it; or (2) the defendant, by omission or nonfeasance, fails to prevent harm to the plaintiff despite an obligation to do so, as where the defendant passively tolerates peril after voluntarily assuming responsibility to protect the plaintiff from it."  *Mita v. Guardsmark, LLC,* 182 Wn. App. 76, 84, 328 P.3d 962 (2014).  When public officials "do act, they have a duty to act with reasonable care," and the public duty doctrine does not bar claims for negligence."  *Washburn v. City of Federal Way,* 178 Wn.2d 732, 758, 310 P.3d 1275 (2013).  It is Plaintiffs position that SPD

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 18

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

officers breached their duty as they owed a duty to Che Taylor as an individual because he was no longer being treated as the public in general given that he was surrounded by SPD officers, and these officers had drawn their weapons on him.  Plaintiff believes that when officers draw guns and point them at a civilian and commands are given to that civilian which are to be obeyed and it appears the civilian is attempting to comply with those commands, then a special relationship does in fact exist. In this case, SPD officers owed a duty to Che Taylor given the special relationship as set forth above. SPD officers were negligent as they failed to exercise reasonable care as a reasonably prudent person would have known that it is impossible to obey contradictory and conflicting commands.  SPD officers breached that duty and caused resulting in Che Taylor's death and were the proximate cause of his death.  SPD's negligence was the proximate cause of Che Taylor's death.  The jury must decide whether it was foreseeable that SPD officers could cause and create this chaotic situation.  The SPD manual itself provides an explicit example of what not to do -give conflicting and contradictory commands such as put your hands up and get down.  Thus, the Court should allow this claim to proceed.

**Violation of RCW 49.60.030**

Washington Law Against Discrimination, RCW 49.60.030 *et seq.* ("WLAD") declares that each person has a right to be free from discrimination based on, among other things, race, creed, color, national origin, and mental disability. Wash. Rev. Code § 49.60.030 (West 2018).  The Court of Appeals liberally construes Washington's law against discrimination to achieve its purpose of eliminating and preventing discrimination.  *See Griffith v. Boise Cascade Inc.,* 111 Wash. App. 436, 45 P.3d. 589 (2002).  First, the statute begins its non-exhaustive list by noting that places of public resort, accommodation, assemblage, or amusement "includes, but is not limited to" a diverse list of locations, which includes "for the sale of goods, merchandise, services, or personal property. RCW

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 19

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

49.60.040(2).    In this case, there is evidence that SPD officers knew that Che Taylor was an African American and was complying with SPD officers' commands.   Notably, the two white individuals that were detained in the same vehicle were handled differently by law enforcement.  In this case the plaintiff relies on the video, both white individuals were not shot and killed by the SPD officers.  Che Taylor was treated differently because he was an African American, and SPD discriminated against him because of his race.  Thus, the Court should allow Plaintiff's WLAD claim to proceed.

**Claims of Estate of Brenda Taylor and Child C.T.**

On October 17, 2018, this Court filed an order on establishing claims for all Plaintiffs, including claims for Brenda Taylor, individually, and Child C.T.  See Dkt. 26 p. 13-14.  Brenda Taylor had and made a claim when she was alive and Plaintiffs believe it passes onto her Estate per RCW 4.20.046-60.  Defendants cite the *Wheeler* case, 894 F.3d 1046 (9th Cir. 2018), which is distinguishable as Wheeler (the child) provided no authority supporting the proposition that an individual without a legal relationship to the decedent could bring a claim under § 1983.   *Id*. at 1057.  Unlike Wheeler, here, C.T does have a legal relationship with Che Taylor and a familial bond existed.  Che Taylor is C.T's father.  C.T. will never get a hug from him or hear his voice because he was shot and killed by these officers.  Thus, the Court should allow the claims for these Plaintiffs to proceed.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully request that this Court deny Defendants' motion for summary judgment and allow Plaintiffs claims against Defendants to proceed.

DATED this 16th day of April 2020.

By */s/ Jesse Valdez*_____
Jesse Valdez, WSBA #35378
VALDEZ LEHMAN, PLLC.
Co-Counsel and Attorney for Plaintiff

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 20

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

1

By /s/ *James Bible*
James Bible, WSBA #33985
James Bible Law Group

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION
FOR SUMMARY JUDGMENT
(2:18-CV-00262-TSZ) – Page 21

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130

1

2

**CERTIFICATE OF SERVICE**

3     I hereby certify that on April 16, 2020, I electronically filed the foregoing Response to
Defendants Motion for Summary Judgment the Clerk of the Court using the CM/ECF system which
4 will send notification of this filing to the attorneys of record and all registered participants.

5                                  By */s/ Jesse Valdez*_____
                                   Jesse Valdez, WSBA #35378
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**VALDEZ LEHMAN, PLLC**
14205 SE 36th St. Ste. 100
Bellevue, WA  98006
P: 425.458.4415
F: 425.732.0130