1

2

3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

4

5

6

7

DEVITTA BRISCOE, as executor of the
ESTATE OF CHE ANDRE TAYLOR; JOYCE
DORSEY; CHE ANDRE TAYLOR, JR.;
SARAH SETTLES on behalf of C.M.T., a
minor; and DEMEKA GREEN, as executor of
the ESTATE OF BRENDA TAYLOR,

8

Plaintiffs,

C18-262 TSZ

9

v.

10

ORDER

CITY OF SEATTLE; MICHAEL and "JANE
DOE" SPAULDING; SCOTT and "JANE
DOE" MILLER; TIMOTHY and "JANE DOE"
BARNES; and AUDI and "JANE DOE"
ACUESTA,

11

12

13

Defendants.

14          This case involves the shooting death of Che Andre Taylor.  In more than one

15 way, it is a "they said, he's dead" case.[1]  The "they" in that phrase are members of the

16 Seattle Police Department ("SPD").  The phrase is apropos because "they" say Taylor

17 was reaching for a gun when he was shot multiple times at point-blank range, but

18 Taylor's version of events will never be known because the bullet wounds were fatal.

19 The phrase is also fitting because issues of liability in this matter involve what "they"

20 said to Taylor in the moments shortly before he died.

21

22 [1] According to the Ninth Circuit, "[n]obody likes a game of 'he said, she said,'" but the game of
"[they] said, he's dead" is "far worse."  _Cruz v. City of Anaheim_, 765 F.3d 1076, 1077 (9th Cir.
23 2014).

ORDER - 1

1    The incident leading to Taylor's death occurred in February 2016.  An inquest was

2    conducted in February 2017, _see_ Sharifi Decl. at ¶ 5 & Exs. 4(a) – 4(e) (docket no. 83),

3    and no criminal charges were filed against any officer involved.  This civil action

4    commenced in February 2018.  _See_ Compl. (docket no. 1).  After three revisions of the

5    operative pleadings, plaintiffs are now (i) Devitta Briscoe, Taylor's sister and the

6    executor of his estate, (ii) Joyce Dorsey, Taylor's mother, (iii) Che Andre Taylor, Jr.,

7    Taylor's adult son, (iv) Sarah Settles on behalf of her daughter, C.M.T., Taylor's minor

8    child, and (v) Demeka Green, the daughter of Taylor's deceased wife, Brenda Taylor, and

9    the executor of her mother's estate.  _See_ 3d Am. Compl. at ¶¶ 2.1 - 2.5 (docket no. 62).

10   They sue the City of Seattle, SPD Officers Audi Acuesta, Timothy Barnes, Scott Miller,

11   and Michael Spaulding, and unknown SPD personnel.  _See id._ at ¶¶ 2.6 - 2.11.  In their

12   Third Amended Complaint, plaintiffs[2] assert the following claims:  (i) negligence;

13   (ii) outrage; (iii) false arrest; (iv) unlawful seizure; (v) discrimination in violation of

14   RCW 49.60.030; and (vi) deprivation of substantive due process rights in violation of

15   42 U.S.C. § 1983.  _See id._ at ¶¶ 5.1 - 5.9.

16       This matter comes before the Court on defendants' motion for summary judgment,

17   docket no. 73, in which they seek dismissal of all claims on various grounds, including

18

---

19   [2] Contrary to the caption of the case, the operative pleading does not identify any claim that
     Briscoe asserts individually.  _See_ 3d Am. Compl. (docket no. 62).  As Taylor's sister, and not his

20   child, parent, or spouse, Briscoe cannot assert a substantive due process claim.  _See Ward v. City
     of San Jose_, 967 F.2d 280, 283-84 (9th Cir. 1991).  Moreover, although the Third Amended

21   Complaint pleads that "defendants are liable to all plaintiffs" on each of the other five claims,
     those causes of action are cognizable only pursuant to the wrongful death and survival of actions

22   statutes, and they are brought by Briscoe solely as executor of Taylor's estate, for the benefit of
     one or more of the other plaintiffs in this matter.  _See_ RCW 4.20.010, .020, & .046.  Thus, the

23   caption is AMENDED to name Briscoe as a plaintiff only in her capacity as executor of Taylor's
     estate.

ORDER - 2

1  (i) qualified immunity as to the § 1983 claims brought against Acuesta, Barnes, Miller,

2  and Spaulding, individually, (ii) failure to establish the policy or practice required for

3  municipal liability under § 1983 pursuant to _Monell v. Dep't of Soc. Servs. of N.Y.C._, 436

4  U.S. 658 (1978), (iii) the bar on personal injury or wrongful death claims that is set forth

5  in RCW 4.24.420, and (iv) lack of merit.  Having reviewed all papers and other materials

6  filed in support of, and in opposition to, defendants' motion, the Court now enters this

7  Order.  The Court concludes that, because plaintiffs are entitled to have every reasonable

8  inference from the evidence drawn in their favor, the key questions of whether the

9  officers involved reasonably believed Taylor was armed when they approached to arrest

10  him and whether they reasonably believed he was reaching for a weapon at the time they

11  shot him cannot be decided on summary judgment.  As a result, whether Miller and

12  Spaulding are entitled to qualified immunity cannot be determined before trial.  Certain

13  other matters, however, can be resolved as a matter of law, and plaintiffs' case can be

14  narrowed for trial.

15  **Background**

16  **A.**     **Events Preceding the Shooting**

17           On the afternoon of February 21, 2016, two members of SPD's Anti-Crime Team

18  ("ACT"), a unit that focuses on "street-level narcotics and vice activity," _see_ Miller

19  Decl. at ¶ 3 (docket no. 81), were conducting surveillance from an unmarked vehicle near

20  an apartment located at 2024 NE 85th Street #3 in Seattle, Washington.  _See_ Miller

21  Interview, Ex. A to Miller Decl. (docket no. 85-1 at 8).  These ACT officers, Miller and

22  Spaulding, were there to arrest Sean Kelly, for whom a no-bail warrant was outstanding.

23  _See_ Spaulding Interview, Ex. A to Spaulding Decl. (docket no. 82 at 6).  While waiting

ORDER - 3

1   for Kelly to emerge from the apartment, Miller and Spaulding saw a Dodge Magnum

2   drive up and park on the opposite side of street from them.  *See id.* (docket no. 82 at 6-7).

3   Spaulding, who knew from social media that Taylor had recently acquired a Dodge

4   Magnum, wondered if Taylor was in the vehicle; both Miller and Spaulding were

5   acquainted with Taylor from previous contacts.  *See id.* at 7.  According to Miller, as

6   Taylor was getting out of the Dodge Magnum, Miller recognized him and saw a black

7   handgun in a holster on Taylor's right hip.  Miller Interview (docket no. 85-1 at 8).

8   Miller told Spaulding that he had seen "a Glock, it's on his right hip."  *See* Spaulding

9   Interview (docket no. 82 at 7).

10          Miller ran a check and confirmed that Taylor was a felon, considered by federal

11   authorities to be an "armed career criminal."  Miller Interview (docket no. 85-1 at 8).

12   After Taylor went into the apartment that Kelly was believed to be occupying, Miller

13   radioed a request for backup to apprehend Taylor on suspicion of being a felon in

14   possession of a firearm.  *See id.* (docket no. 85-1 at 9).  Acuesta and Barnes, who were on

15   routine patrol, were dispatched to assist during the arrest, and they staged themselves a

16   block west.  Acuesta Report, Ex. A to Acuesta Decl. (docket no. 74 at 4).  A "simple

17   plan" was devised whereby Miller and Spaulding would signal when Taylor came out of

18   the apartment and everyone would move in to arrest him.  *See* Miller Interview (docket

19   no. 85-1 at 10).

20          Just before Taylor exited the apartment, however, an older Sport Utility Vehicle

21   ("SUV") pulled up and partially blocked Miller's and Spaulding's views.  *Id.*  They could

22   see that Taylor was outside the apartment, talking to one or two other males, but then

23   they lost sight of him.  *Id.*  When the SUV drove away, Taylor was gone.  *Id.*  Sometime

ORDER - 4

later, a white sedan (a 1995 Ford Taurus) arrived and parked directly behind Taylor's

Dodge Magnum.  *Id.*; *see also* Kineticorp Report at 1, Ex. B to Neale Decl. (docket

no. 79 at 16) (describing the make and model of the sedan).  At that point in time, Taylor

had not been under Miller's or Spaulding's unobstructed observation for approximately

thirty minutes.[3]

The Ford Taurus had three occupants:  a white male later identified as

Tom Papageorge was in the driver's seat, a white female later identified as Noelle

Knudsvig was in the rear passenger's seat, and a black male later identified as Taylor was

in the front passenger's seat.  *See* Noble Report at ¶¶ 26 & 27, Ex. B to Noble Decl.

(docket no. 80 at 45-46).  Taylor got out of the Ford Taurus and, with the passenger door

still open, stood facing inside the car.  *See* Miller Interview (docket no. 85-1 at 11).

Miller and Spaulding gave the signal to move in to arrest Taylor.  *Id.*  Miller and

Spaulding then got out of their vehicle, armed with a shotgun and a rifle, respectively,

and approached Taylor, while one or both of them allegedly yelled "Seattle Police."  *See*

*id.*; Inquest Tr. (Spaulding), Ex. 4(a) to Sharifi Decl. (docket no. 83-1 at 33).  Both Miller

and Spaulding were dressed in plain clothes, but prior to exiting their vehicle, they had

donned either a jacket or vest, respectively, bearing the word "POLICE" across the front

---

[3] Miller and Spaulding could not see Taylor at all after he entered the surveilled apartment,
which was sometime before 3:45 p.m., when Miller requested backup.  *See* Miller Interview
(docket no. 85-1 at 9); Barnes Report, Ex. A to Barnes Decl. (docket no. 75 at 4).  At 4:03 p.m.,
the ACT officers radioed that Taylor had exited the apartment, but at 4:14 p.m., shortly before
the white Ford Taurus appeared, they advised that Taylor was "no longer visible."  Barnes
Report (docket no. 75 at 4).

1   chest.  Inquest Tr. (Miller), Ex. 4(b) to Sharifi Decl. (docket no. 83-1 at 45); Spaulding

2   Interview (docket no. 82 at 15).

3   **B.      "Their" Version of the Shooting**

4           Although the patrol car carrying Acuesta and Barnes was equipped with a dash-

5   mounted camera, the key events of the day cannot be seen on the recording, having been

6   obstructed from view by the Ford Taurus.  The encounter with Taylor, prior to the

7   shooting, lasted only five to six seconds.  The recording shows Miller and Spaulding

8   beginning their approach toward the Ford Taurus before 4:15:48 p.m. on February 21,

9   2016.  *See* Fig. 1.  By 4:15:53 p.m., Taylor had been fatally wounded.  *See* Fig. 2.



Fig. 1:  Still captured from Ex. A to Valdez Decl. (docket no. 94) (red labels added).

Fig. 2:  Still captured from Ex. A to Valdez Decl. (docket no. 94).

ORDER - 6

During a recorded interview conducted shortly after midnight on the day of the shooting, Miller stated that, as he walked toward Taylor, he yelled "Seattle Police," called Taylor by a nickname ("Che T"), and said, "let me see your hands," "show me your hands, get on the ground."  Miller Interview (docket no. 85-1 at 11-12).  Figure 1, *supra*, shows the relative positions of the officers and Taylor when these commands were issued.[4]  Miller contends that, as he rounded the rear of the vehicle, he saw Taylor crouch slightly into the car and turn a bit toward him, and that Taylor's right arm made a "telltale sign of going for a weapon."  Miller Interview (docket no. 85-1 at 12).  Miller then fired one round from his shotgun.  *Id.*

When Spaulding was interviewed about the incident, roughly three hours before Miller, he said that, while he was approaching Taylor, he also called Taylor "Che T," and directed Taylor two or three times to show his hands and get down on the ground.  Spaulding Interview (docket no. 82 at 9).  According to Spaulding, Taylor replied, "hey, what, what, what's going on, what's going on," and then said, "okay, okay," but instead of "simply dropp[ing] down to his knees," Taylor "turned to his right" and "started slouching over into the car."  *Id.*  Spaulding allegedly saw Taylor's right arm drop, his right hand go to his waist, and his elbow come up, and Spaulding told investigators that he "knew right there that [Taylor] was drawing for the handgun."  *Id.*  On the recording,

---

[4] As Miller and Spaulding began moving toward the white sedan, Acuesta and Barnes arrived and exited their patrol vehicle.  *See* Acuesta Report (docket no. 74 at 4).  Barnes also gave Taylor commands to "get on the ground."  Barnes Report (docket no. 75 at 4).  Meanwhile, Acuesta yelled at Papageorge, who was in the driver's seat of the Ford Taurus, "hands" and "let me see your hands."  Noble Report at ¶ 21(i) (docket no. 80 at 39).

1  Spaulding can be heard saying "hey, no" two times, right before firing his rifle multiple

2  times.  *See* Inquest Tr. (Spaulding) (docket no. 83-1 at 36); *see also* Ex. A to Valdez

3  Decl. (docket no. 94).  After being shot, Taylor slumped into the vehicle and fell to his

4  back and side, at which point Spaulding purportedly saw that a holster on Taylor's right

5  hip was empty.  Spaulding Interview (docket no. 82 at 9).

6       In the accounts given within hours after the shooting, neither Miller nor Spaulding

7  mentioned that Taylor had raised his hands before beginning to lower himself to the

8  ground.  Approximately a year later, however, Spaulding testified that Taylor put his

9  hands up about "chest high," and initially appeared to obey the officers' commands to get

10  on the ground.  *See* Inquest Tr. (Spaulding) at 1040:15-18 (docket no. 83-1).  A

11  computer-generated animated sequence, which was commissioned by defendants, depicts

12  Taylor, with his hands visible to the officers, just moments before he was shot.



Fig. 3:  Snapshot captured from Ex. C to Neale Decl. (docket no. 71) (labels added).

The animation, created by William T.C. Neale, the Director of Visualization and a co-

founder of Kineticorp, *see* Neale Decl. at ¶ 2 (docket no. 79), is otherwise cumulative of

the dash-camera recording and the narratives that Miller and Spaulding offered on the

1   day of the shooting and, to the extent Neale's simulation was submitted by defendants in

2   an attempt to bolster the officers' credibility, it is not relevant.

3   **C.    Post-Shooting Investigation**

4          **1.    Firearm and Holster**

5          After the shooting, a black Springfield Armory XDS .45 caliber handgun was

6   located underneath the front passenger seat of the Ford Taurus.  Haakenstad Decl. at ¶ 3

7   (docket no. 77).  The weapon was oriented with the barrel pointing toward the front of the

8   vehicle and the grip facing the rear of the car.  _See_ Ex. A to Charles Miller Decl. (docket

9   no. 76 at 4-5).  When photographed prior to its removal from the Ford Taurus, the gun

10  was covered with debris.  _See_ Ex. A to Haakenstad Decl. (docket no. 77).  Latent prints

11  recovered from the firearm were not of identification value, and no comparison could be

12  made with respect to deoxyribonucleic acid ("DNA"), contributed by at least five

13  different individuals, that was found on various surfaces of the pistol, including the grip,

14  trigger, magazine, and cartridges.  Gilbertson Report at ¶ 27, Ex. B to Gilbertson Decl.

15  (docket no. 90-2).[5]

16  _____

17  [5] Defendants have moved to strike Gilbertson's declaration and opinions, incorporating by
    reference the arguments made in their separate motion, docket no. 86, to preclude Gilbertson

18  from testifying at trial.  _See_ Reply at 2-4 (docket no. 97).  For the past 20 years, Gilbertson has
    been a tenured professor at Centralia College, where he teaches and serves as Faculty Director of
    the Criminal Justice Program.  Gilbertson Report at ¶¶ 3 & 7 (docket no. 90-2).  He was

19  previously employed as a police officer in Atlanta and LaGrange, Georgia.  _Id._ at ¶ 9.  He has a
    Master of Science degree in Justice Administration from Columbus State University in Georgia,

20  and has completed over 1,000 hours of law enforcement and special weapons and tactics
    ("SWAT") training, education, and operational experience.  _Id._ at ¶ 12.  Defendants challenge

21  Gilbertson's qualifications on the grounds that he was never commissioned as an officer in
    Washington, did not attend any training classes in Washington, never trained other police

22  officers, was never involved in a situation in which he or a fellow officer used deadly force with
    a firearm, and last worked as a police officer in 1996.  _See_ Defs.' Mot. at 3 (docket no. 86).

23  These attacks on Gilbertson's credentials go to the weight, not the admissibility, of his opinions,

ORDER - 9

1    An empty holster was also discovered at the scene.  _See_ Haakenstad Decl. at ¶ 3 &

2    Ex. B (docket no. 77).  According to SPD Detective Lisa Haakenstad, the holster was of a

3    type often sold with the model of firearm found under the seat of the Ford Taurus.  _See id._

4    at ¶ 3.  In her declaration, Haakenstad seems to suggest that the holster was found

5    attached to Taylor's belt at the right hip.  _See id._  The only holster logged as evidence,

6    however, was apparently located on the street, near the right rear door of the Ford Taurus.

7    _See_ Gilbertson Report at ¶ 29 (docket no. 90-2) (citing Haakenstad Report at 7).  The

8    holster can be detached from a belt without unbuckling it.  _See id._  A firefighter, who

9    arrived at the scene after the shooting, testified at the inquest that, as he cut off Taylor's

10   clothes, he saw a holster, but no gun.  Noble Report at ¶¶ 31(b) & (d) (docket no. 80).

11         **2.    Occupants of the Ford Taurus**

12         Although the driver of the Ford Taurus, Papageorge, had perhaps the best vantage

13   point to observe the incident, no party has submitted a declaration by him concerning the

14   events of February 21, 2016.  During the course of the investigation concerning Miller's

15   and Spaulding's use of force, however, Papageorge denied seeing Taylor with a gun on

16   the day of the shooting.  _See_ Noble Report at ¶ 27(c) (docket no. 80) (citing Force

17   Investigation Report).  Papageorge explained that Taylor had come to the trailer park

18   (referring to the now defunct University Trailer Park at 2101 NE 88th Street) and asked

19   for a ride to his vehicle.  _Id._ at ¶ 27(a).  He recounted that later, as a police car was

20

21   _____

22   and they do not provide a basis to entirely disregard Gilbertson's declaration or report in
     connection with the pending motion for summary judgment.  Certain portions of Gilbertson's
     declaration and/or report are addressed separately in this Order.  _See infra_ notes 10, 12, 13, & 15.

23

1  approaching, Taylor began to "wrestle in his seat and move around," but Papageorge

2  "wasn't paying attention." _Id._ at ¶ 27(d).

3      Similarly, no party has provided a statement under oath from Knudsvig, the rear

4  passenger of the Ford Taurus.  Shortly after the shooting, Knudsvig made the following

5  unsolicited remarks while in an SPD patrol car:  "Yeah, the guy I was with earlier, he -- a

6  friend of my friend's, he was all of a sudden -- I didn't know he was -- I didn't know he

7  was running from the law.  But anyways, they were just like, you know, just get on the

8  ground, and he pulled out -- I think he pulled out a gun."  Ex. 3 to Sharifi Supp. Decl.

9  (docket nos. 96 & 98); _see_ Tr. (Feb. 21, 2016) at 5:9-14 (docket no. 104).  Knudsvig also

10 indicated that she "couldn't see past the seat" and "couldn't really see to tell you the

11 truth, 'cause it was from the front seat and [she] was in the back."  Noble Report at

12 ¶ 26(b) (docket no. 80) (citing Force Investigation Report).  When asked whether Taylor

13 reached for a gun, Knudsvig replied, "Yeah, he did.  He, when the cop was ta – yelling

14 get out the car, you know, he had, he was reaching for his gun, okay." _Id._ at ¶ 26(e).

15     Knudsvig's ramblings are internally inconsistent and vary from the recollections

16 of other witness.  Although Knudsvig said that she couldn't "really see" what happened,

17 she also described Taylor "pull[ing] out" a firearm, which not even the officers allege he

18 actually did, while being instructed to "get out" of the vehicle, which no one says Taylor

19 was told to do; Taylor was already standing outside the Ford Taurus when Miller and

20 Spaulding confronted him.  Plaintiffs further argue that Knudsvig is not credible because,

21 on the day of the shooting, she falsely identified herself using her sister's name, was

22 found in possession of a syringe containing suspected heroin, and had an outstanding

23

ORDER - 11

1   warrant for her arrest.  *See* Valdez Am. Decl. at ¶¶ 3-4 & 6 & Exs. B & D (docket

2   nos. 107, 107-2, & 107-4).  In deciding defendants' pending motion for summary

3   judgment, the Court need not evaluate Knudsvig's veracity; rather, the Court simply

4   notes that Knudsvig's unsworn utterances neither corroborate nor contradict the officers'

5   recitation of events.[6]

6   **Discussion**

7   **A.     Qualified Immunity**

8        Because qualified immunity is "an *immunity from suit* rather than a mere defense

9   to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original), the

10  Court begins its analysis with this controversial doctrine.  Although qualified immunity

11  jurisprudence is due for a major overhaul, *see Baxter v. Bracey*, 140 S. Ct. 1862 (2020)

12  (Thomas, J., dissenting from denial of certiorari); *Jamison v. McClendon*, --- F. Supp. 3d

13  ---, 2020 WL 4497723 (S.D. Miss. Aug. 4, 2020), the Court is currently bound by the

14  following standards.  With regard to a claim brought under § 1983, an individual

15  defendant is entitled to qualified immunity if either of the following criteria are satisfied:

16  (i) the alleged facts do not demonstrate a constitutional violation; or (ii) the constitutional

17  right allegedly violated was not "clearly established" at the time of the events at issue.

18  *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by*

19  *Pearson v. Callahan*, 555 U.S. 223 (2009).[7]

20  _____

21  [6] In light of this observation, defendants' motion, docket no. 106, seeking leave to file a motion
    to strike plaintiffs' counsel's declarations disparaging Knudsvig, is STRICKEN as moot.

22
23  [7] In *Pearson*, the Supreme Court held that the elements of the qualified immunity standard need
    not be addressed in any particular sequence.  555 U.S. at 236 (overruling *Saucier* to the extent

1    Qualified immunity is intended as a means of balancing the need "to hold public

2    officials accountable when they exercise power irresponsibly" against the need "to shield

3    officials from harassment, distraction, and liability when they perform their duties

4    reasonably." _Pearson_, 555 U.S at 231.  It presently protects governmental actors when

5    they make reasonable mistakes of fact, reasonable mistakes of law, or reasonable

6    mistakes of mixed law and fact.  _Id._  _But see_ _Stephenson v. Doe_, 332 F.3d 68, 78-79

7    (2d Cir. 2003) (observing that a reasonable mistake of fact concerning whether the level

8    of force used was justified goes only to the question of whether the individual's

9    constitutional rights were violated, and not to whether the officer is entitled to qualified

10   immunity).  Qualified immunity is said to shield "all but the plainly incompetent or those

11   who knowingly violate the law." _Malley v. Briggs_, 475 U.S. 335, 341 (1986).

12   In seeking qualified immunity, the individual defendants invoke Federal Rule of

13   Civil Procedure 56, which authorizes the Court to grant summary judgment if no genuine

14   issue of material fact exists and the moving party is entitled to judgment as a matter of

15   law.  _See_ Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the

16   absence of factual disputes. _E.g._, _Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986).  In

17   assessing whether questions of fact preclude summary judgment, the Court must construe

18   the evidence in the light most favorable to the adverse party. _See_ _Orn v. City of Tacoma_,

19

20   _____

21   that it mandated a rigid two-step protocol).  In adopting a more flexible approach than was
     originally articulated in _Saucier_, the _Pearson_ Court recognized that, in some cases, a court can

22   more "quickly and easily decide" the defendant did not violate "clearly established" law, and
     thereby avoid the "more difficult question whether the relevant facts make out a constitutional
     question at all." _See_ _id._ at 239, 242, 243-45.

23

949 F.3d 1167, 1171, 1174 (9th Cir. 2020); <u>see also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 378

(2007).  Whether an officer is entitled to qualified immunity is an issue of law that must

be decided by the Court, <u>see</u> <u>Hunter v. Bryant</u>, 502 U.S. 224, 228 (1991), but the Court

may submit the related factual matters to the jury, <u>see</u> <u>Morales v. Fry</u>, 873 F.3d 817, 824

(9th Cir. 2017).

### 1.    <u>Constitutional Violations</u>

Plaintiffs allege two different violations of the Fourth Amendment, namely (i) a

warrantless arrest effected without probable cause, and (ii) the use of excessive force.

They seek to hold four officers individually liable, namely Acuesta, Barnes, Miller, and

Spaulding.[8]  Defendants move to dismiss plaintiffs' claims against Acuesta and Barnes

because they did not use any force against Taylor.  Defs.' Mot. at 11 n.8 (docket no. 73).

A police officer cannot be held liable for an alleged constitutional violation simply

because he or she was present or was a member of a team; rather, for liability to attach,

the evidence must establish the individual's own participation in the constitutional tort.

<u>Jones v. Williams</u>, 297 F.3d 930, 937 (9th Cir. 2002); <u>Chuman v. Wright</u>, 76 F.3d 292,

294-95 (9th Cir. 1996).  Because Acuesta and Barnes did not themselves prompt Taylor's

arrest or deploy lethal force against him, plaintiffs' claims against them are DISMISSED

---

[8] Although plaintiffs, in their operative pleading, alluded to "unknown police officers" who were
"acting within the course and scope of [their] employment with the City of Seattle and under
color of law," <u>see</u> 3d Am. Compl. at ¶ 2.11 (docket no. 62), they have not named any other
defendants.  The deadlines for joining parties and amending pleadings have expired, <u>see</u> Minute
Order (docket no. 18); Minute Order (docket no. 39), and any claims against "unknown police
officers" are DISMISSED with prejudice for failure to prosecute.  <u>See</u> Fed. R. Civ. P. 41(b).

1   with prejudice.[9]  The Court now turns to plaintiffs' unlawful arrest and excessive force

2   claims against Miller and Spaulding.

3               a.      **Probable Cause to Arrest**

4           A claim for unconstitutional seizure is cognizable under § 1983 if an arrest was

5   initiated "without probable cause or other justification."  *See* *Dubner v. City & Cty. of*

6   *San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001).  Probable cause is evaluated with

7   respect to "the totality of circumstances" known to the arresting officer.  *Id.* at 966.

8   The Court's inquiry is whether "a prudent person" in the same situation would have

9   concluded that "a fair probability" existed that the person arrested had committed a

10  crime.  *Beier v. City of Lewiston*, 354 F.3d 1058, 1065 (9th Cir. 2004).

11          In this matter, plaintiffs do not dispute that Taylor was a felon and that, on the day

12  in question, his possession of a firearm would have constituted a crime.  The key issue is

13  whether the officers involved had probable cause to believe Taylor had a gun at the time

14  they seized him by approaching with lethal force and commanding him to get on the

15  ───────────────

16  [9] Because neither Acuesta nor Barnes instigated the arrest or fired a weapon at Taylor, the
    predicates for the outrage, unlawful seizure, excessive force, discrimination, and substantive due

17  process claims against them cannot be established.  In their surreply, plaintiffs argued that
    Acuesta and Barnes should be held individually liable because they gave inconsistent commands

18  to Taylor.  *See* Surreply at 1-2 (docket no. 99).  With respect to Acuesta, plaintiffs provide no
    evidence that he issued any commands to Taylor.  As to Barnes, who ordered Taylor to get on

19  the ground, plaintiffs make no showing that such command differed from the directives of Miller
    and Spaulding.  Plaintiffs further fail to explain how telling Taylor to get on the ground would,

20  by itself, implicate Barnes in any unlawful arrest or use of excessive force.  Moreover, to the
    extent that plaintiffs allege Acuesta and/or Barnes were negligent in giving instructions to

21  Taylor, the appropriate defendant is not the individual officers, who were acting within the scope
    of their employment, but rather the City of Seattle.  *See* *Beltran-Serrano v. City of Tacoma*, 193

22  Wn.2d 537, 551-52, 442 P.3d 608 (2019).  The Court having considered and rejected plaintiffs'
    basis for asserting claims against Acuesta and Barnes, defendants' motion, docket no. 106, for

23  leave to file a motion to strike plaintiffs' surreply, is STRICKEN as moot.

ORDER - 15

1    ground.  Only Miller is alleged to have seen a weapon in a holster on Taylor's right hip

2    approximately thirty minutes earlier; Spaulding did not make a similar observation and

3    relied solely on what he heard from Miller.  Plaintiffs have offered no basis for

4    disbelieving Miller's statement that Taylor was armed when he exited the Dodge

5    Magnum earlier in the afternoon.  Instead, plaintiffs argue that Miller's information and

6    the resulting probable cause were "stale" before the officers tried to apprehend Taylor

7    because they had lost sight of him on two different occasions (for a total of roughly thirty

8    minutes):  once when he entered the surveilled apartment, and again when he left the

9    scene.[10]  In addition, their view of Taylor in the moments before they confronted him was

10    obstructed by the Ford Taurus, and they could not confirm that he was still carrying a

11    gun.

12           "[T]ime is a crucial element of probable cause."  _United States v. McCall_, 740

13    F.2d 1331, 1335 (4th Cir. 1984).  "Probable cause ceases to exist when it is no longer

14    reasonable to presume that items, once located on the premises [or the person], are still

15    there."  _United States v. Brinklow_, 560 F.2d 1003, 1005 (10th Cir. 1977).  Given the

16    amount of time and reasons that Taylor could not be observed, and his return to the scene

17

18    [10] In support of this contention, plaintiffs rely on Gilbertson's opinion.  _See_ Gilbertson Decl. at

19    ¶ 4 (docket no. 90).  Gilbertson's view constitutes a legal conclusion that is outside the bounds of
proper expert testimony.  _See Fontana v. City of Auburn_, 2014 WL 4162528 at *6 (W.D. Wash.

20    Aug. 21, 2014) ("expert testimony is impermissible insofar as it attempts to explain the legal
requirements of probable cause or discusses whether probable cause did or did not in fact exist"

21    (citing _Torres v. City of Los Angeles_, 548 F.3d 1197, 1214 n.11 (9th Cir. 2008), and _Stuart v.
United States_, 23 F.3d 1483, 1487 (9th Cir. 1994))).  Defendants' motion to strike, _see_ Reply at

22    2-3 (docket no. 97), is GRANTED as to this particular testimony, but plaintiffs are entitled to
make, and have made, _see_ Resp. at 7-8 (docket no. 88), the same argument concerning the
inferences to be drawn from the evidence.

23

ORDER - 16

as a passenger in a vehicle occupied by two other people, one of whom later denied

seeing him with a gun on the day of the shooting, the Court concludes that "room for a

difference of opinion" exists concerning whether the facts and their reasonable inferences

indicate that Taylor's seizure was supported by probable cause.  *See* *Chelios v. Heavener*,

520 F.3d 678, 686 (7th Cir. 2008); *see also* *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th

Cir. 1984) ("the factual matters underlying the judgment of reasonableness generally

mean that probable cause is a question for the jury").

### b.    Excessive Force

Generally, the question of whether an individual has been subjected to excessive

force requires a balancing of "the nature and quality of the intrusion on the individual's

Fourth Amendment interests against the countervailing governmental interests at stake."

*Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (quoting *Graham v. Connor*,

490 U.S. 386, 396 (1989)).  The facts and circumstances of each particular case must be

examined, including "the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight."  *Id.* (quoting *Graham*, 490 U.S.

at 396).  Other considerations include the quantum of force used, the availability of

alternative methods of capturing or detaining the suspect, and the suspect's mental and

emotional state.  *Id.*  The Court must evaluate "the totality of the circumstances," judging

the reasonableness of the particular use of force from the perspective of a reasonable

officer on the scene, not with "the 20/20 vision of hindsight," and bearing in mind that

police officers need not use the least intrusive means available to them.  *Id.* at 980, 982.

The dispositive question in this matter is whether, when Miller and Spaulding shot Taylor, they reasonably believed that he was reaching for a gun and thereby posed an immediate threat to their safety.  In arguing that this issue should be reserved for the trier of fact, plaintiffs rely primarily on _Cruz v. City of Anaheim_, 765 F.3d 1076 (9th Cir. 2014).  Although _Cruz_ is not entirely analogous, it does suggest that a reasonable jury could, in certain circumstances, disbelieve the accounts of several officers even though the perspective of the individual who was shot and killed could not be known.  In other words, a "they said, he's dead" situation does not necessarily result in summary judgment with respect to an excessive force claim.

In _Cruz_, police officers surrounded the suspect with weapons drawn and directed him to get on the ground as he was emerging from his vehicle.  _Id._ at 1078.  According to four of the five officers, the suspect ignored these commands and reached for the waistband of his pants, where an informant had reported he was carrying a gun.  _Id._ at 1078 & 1079 n.2.  The suspect was shot multiple times and died.  _Id._ at 1078.  A weapon was not found on the suspect's person, but rather in the front passenger seat, with the safety on.  _Id._ at 1078 & 1079 n.3.  Given these facts, the Ninth Circuit observed that an officer's shooting of a person who reaches for a firearm is "unquestionably reasonable." _Id._ at 1078.

In deciding, however, that a jury could distrust the four officers' version of events and find that the suspect was essentially "executed," the Ninth Circuit reasoned as follows.  The suspect could see that he was surrounded by officers with guns drawn.  _Id._ at 1079.  To reach for a weapon in such circumstances would have been foolish (or

1    suicidal), but to make such gesture when no gun is present "makes no sense whatsoever."

2    _Id._  One of the officers involved in the shooting provided the same "reached for

3    waistband" explanation when he killed another unarmed man two years later.  _Id._ at 1080.

4    According to the Ninth Circuit, although "they both reached for a gun" might be a

5    plausible defense, "they both reached for no gun" is not.  _Id._  In addition, the Ninth

6    Circuit thought a jury could (i) be skeptical that all four officers had a line of sight to the

7    suspect's hand as he stood between his vehicle and its open door, and (ii) doubt the

8    officers' credibility about the suspect reaching for his waistband with his right hand given

9    that the suspect was left-handed.  _Id._  The Ninth Circuit further observed that the four

10   officers' story of the suspect exiting the car and standing in the doorway was inconsistent

11   with the fact that, after he was killed, the suspect had to be cut free from his seat belt.  _Id._

12   The only non-police eyewitness indicated that the suspect's feet emerged from the car,

13   but then the suspect seemed to be "'slipping on the ground, like kind of falling down,' as

14   if he were 'tripping.'"  _Id._  In the Ninth Circuit's view, the evidence potentially painted a

15   picture of the suspect trying to get out of his car, but being caught in his seat belt, as

16   opposed to standing next to the vehicle poised to attack multiple police officers whose

17   guns were aimed at him, and the matter needed to be resolved by a jury, not on summary

18   judgment.  _Id._

19          This case has some parallels to _Cruz_, but it does not involve the same types of

20   impeachment evidence.  The record does not suggest that either Miller or Spaulding has

21   been involved in a similar shooting or that they are performing the kind of "song-and-

22   dance" to which _Cruz_ refers.  _See id._  _Cruz_ is also dissimilar because the non-police

23

ORDER - 19

1    witnesses do not contradict the officers' perceptions of Taylor's actions immediately

2    before he was shot.  Nevertheless, in this case, as in _Cruz_, the reasonable inferences from

3    the evidence provide some support for the propositions that Taylor was not armed at the

4    time he was shot and that Taylor was not engaged in the nonsensical act of drawing for a

5    non-existent gun[11] while multiple officers aimed their weapons at him.  Moreover, like in

6    _Cruz_, in which the suspect might have been trying to comply with commands to get on

7    the ground, but got caught in his seat belt, in this matter, Taylor might be viewed by a

8    reasonable jury as having attempted to show his hands and get on the ground, as directed,

9    but having difficulty doing so because the instructions were inconsistent[12] and he was

10   confined within the space between the street curb, the passenger door, and the door frame

11   of the Ford Taurus.  Indeed, reaching for the running board of the vehicle for support, in

12   an effort to lower himself, might explain the movements of Taylor's right arm and elbow.

13   With _Cruz_ in mind, and having considered "the totality of the circumstances" from the

14   perspective of a reasonable officer on the scene, the Court cannot determine, as a matter

15   of law, whether Miller's and Spaulding's use of deadly force was reasonable, given the

16

17   _____

18   [11] Plaintiffs are entitled to the reasonable inferences that Taylor had no holstered weapon and
     that he was not reaching for the Springfield Armory pistol underneath the passenger seat of the

19   Ford Taurus, the grip of which was oriented toward the rear of the vehicle, rendering it difficult
     to quickly retrieve and fire.

20   [12] In addition to observing that the commands "show me your hands" or "hands up" contradict
     the directive to "get on the ground," Gilbertson asserts, based on his education, training, and

21   experience, that "only one _uniformed_ police officer should have been issuing verbal commands
     to Taylor."  Gilbertson Report at ¶¶ 45-47 (docket no. 90-2) (emphasis added).  Gilbertson also

22   opines that one of the commands a uniformed officer should have given was for Taylor to step
     away from the Ford Taurus.  _Id._ at ¶ 47.

23

ORDER - 20

1  severity of the crime[13] and the factual issues concerning whether Taylor posed a threat to

2  the safety of the officers.

3      **2.      Clearly Established Law**

4      The principle underlying qualified immunity is that law enforcement officers must

5  have had notice that their conduct was unlawful before they are subjected to suit.  *See*

6  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Saucier*, 533 U.S. at 206).  To be

7  "clearly established," the contours of the constitutional right alleged to have been

8  violated "must be sufficiently clear that a reasonable official would understand that what

9  he is doing violates that right."  *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640

10  (1987)).  In other words, the "state of the law" must have given "fair warning" to the

11  officer that the conduct in question was unconstitutional.  *Id.* at 739-41; *see A.D. v. Cal.*

12  *Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013).  This "fair warning" does not require

13  that the "very action" at issue be previously deemed unlawful, but rather that the

14  unlawfulness be "apparent" in light of the pre-existing law.  *Hope*, 536 U.S. at 739

15  (quoting *Anderson*, 483 U.S. at 640); *see also Deorle v. Rutherford*, 272 F.3d 1272,

16  1285-86 (9th Cir. 2001) (observing, with respect to the deployment of a lead-filled, cloth-

17

18  _____

19  [13] Gilbertson asserts that "[t]ens of thousands of convicted felons unlawfully possess firearms
20  every day in our nation and remain at large," and that, because Taylor was not, at the moment,
    brandishing a gun, Miller and Spaulding "knew or should have known the most reasonable and
21  prudent course of action was to delay arresting Taylor until he was alone."  Gilbertson Report at
    ¶ 34 (docket no. 90-2).  The Court accepts Gilbertson's observations to the extent they speak to
22  the relative severity of the suspected offense, but Gilbertson's conjecture about the officers'
    knowledge crosses the line into territory reserved for the trier-of-fact and disregards the officers'
23  expressed concerns about Taylor getting away while purportedly armed with a weapon.

1   cased projectile into the face of an unarmed, non-fleeing suspect that, "notwithstanding

2   the absence of direct precedent, the law may be, as it was here, clearly established").

3        The Ninth Circuit has described as a "bedrock Fourth Amendment precept" that an

4   arrest must be supported by probable cause. _Beier_, 354 F.3d at 1065.  In _Beier_, which

5   was decided twelve years before the events of this case, the Ninth Circuit admonished

6   officers who arrested a man for violating a protection order without having acquainted

7   themselves with the terms of the order so that they could assess whether the man had

8   actually violated it. _Id._ at 1069-72.  Although factually distinct, _Beier_ suggests that

9   officers whose mistakes of fact or mixed law and fact stem from a failure to adequately

10  investigate should not be insulated from liability. _See id._ at 1071-72.  The Court is

11  satisfied that, at the time Miller and Spaulding took steps to arrest Taylor, the "clearly

12  established" law required them, in light of the intervening circumstances, to confirm their

13  original basis for probable cause.

14       The Ninth Circuit has also indicated that, prior to February 2016, when Taylor was

15  shot, the law was "clearly established" that law enforcement personnel "may not kill

16  suspects who do not pose an immediate threat to their safety" even if the suspects are

17  armed. _See Van Bui v. City & Cty. of San Francisco_, 699 Fed. App'x 614, 616 (9th Cir.

18  2017) (defining law as of December 2010, quoting _Harris v. Roderick_, 126 F.3d 1189,

19  1204 (9th Cir. 1997)).  Whether Taylor was in possession of a gun and whether he

20  attempted to gain access to it cannot be determined as a matter of law.  Moreover, to the

21  extent that Taylor's movements were misinterpreted as drawing for a non-existent

22  weapon, the Court cannot, consistent with _Beier_, conclude that such mistake of fact was,

23

ORDER - 22

1    as a matter of law, reasonable.  To be clear, the Court is not concluding that Miller and

2    Spaulding are not entitled to qualified immunity; the Court is merely ruling that factual

3    questions preclude a grant of summary judgment on the subject and the issue of whether

4    Miller and Spaulding should be insulated from personal liability must await trial.  _See_

5    _Littrell v. Franklin_, 388 F.3d 578, 585 (8th Cir. 2004) (outlining appropriate special

6    interrogatories to the jury).

7    **B.    _Monell_ Liability**

8         A municipality may not be held liable under § 1983 on a respondeat superior

9    theory.  _Ulrich v. City & Cty. of San Francisco_, 308 F.3d 968, 984 (9th Cir. 2002).

10   Instead, municipal liability must be premised on one of four theories:  (i) a policy or

11   longstanding practice or custom from which the alleged constitutional violation resulted;

12   (ii) an unconstitutional action by an official with final policy-making authority;

13   (iii) ratification by an official with final policy-making authority of a subordinate's

14   unconstitutional conduct; or (iv) a failure to adequately train employees that amounts to

15   "deliberate indifference" concerning the constitutional right at issue.  _See_, _e.g._, _Menotti v._

16   _City of Seattle_, 409 F.3d 1113, 1147 (9th Cir. 2005); _see also_ _City of Canton v. Harris_,

17   489 U.S. 378 (1989).  In response to defendants' motion for summary judgment,

18   plaintiffs have not identified any basis for pursing a § 1983 claim against the City of

19   Seattle.[14]  Moreover, a thorough review of the record reveals no evidence to support any

20

---

21   [14] Plaintiffs asserted in their surreply, without reference to any evidence in the record, that "[a]ll
     officers stated they did not . . . recall receiving any training that would assist them with this
22   incident," and that the City of Seattle's deliberate indifference to training rendered constitutional
     violations "highly foreseeable."  _See_ Surreply at 3 (docket no. 99).  Plaintiffs offer no proof that
23   SPD officers are not trained to handle the arrest of an individual suspected to be armed, and they

of the possible grounds for _Monell_ liability.  Plaintiffs' § 1983 claim against the City of

Seattle is DISMISSED with prejudice.

**C.**     **Bar on Personal Injury or Wrongful Death Claims**

In seeking dismissal of plaintiffs' state law claims, defendants rely on the

following provision:

> It is a complete defense to any action for damages for personal injury
> or wrongful death that the person injured or killed was engaged in the
> commission of a felony at the time of the occurrence causing the injury
> or death and the felony was a proximate cause of the injury or death.
> However, nothing in this section shall affect a right of action under
> 42 U.S.C. § 1983.

RCW 4.24.420.  Defendants contend that Taylor was involved in two felonies at the time

of the shooting, namely unlawfully possessing a firearm, _see_ RCW 9.41.040, and

assaulting law enforcement officers, _see_ RCW 9A.36.011(1)(a) & RCW 9A.36.031(1)(g).

For the reasons already discussed, whether Taylor was engaged in the requisite felony

and whether any such felony was a proximate cause of Taylor's death involve factual

questions that preclude summary judgment.

**D.**     **Merits of Plaintiffs' Claims**

Factual questions also preclude summary judgment on the merits of the

negligence,[15] outrage, unlawful arrest, and excessive force claims asserted by Taylor's

---

cite no authority for the proposition that _Monell_ liability arises if officers are not trained on the
exact scenario they faced in "this incident."

[15] The public duty doctrine, on which plaintiffs focus in responding to defendants' motion for
summary judgment, is no longer an obstacle to plaintiffs' negligence claim.  _See Beltran-Serrano
v. City of Tacoma_, 193 Wn.2d 537, 442 P.3d 608 (2019).  Under _Beltran-Serrano_, a plaintiff may
not base a claim of negligence on an intentional act, like the use of excessive force, but may sue
for "negligent acts leading up to the ultimate use of force."  _Id._ at 546.  Plaintiffs have alleged the

ORDER - 24

estate, as well as the substantive due process claim brought on behalf of Taylor's

children[16] and mother.  The other substantive due process claims, alleged by the estate of

Taylor's deceased wife (Brenda Taylor) and Taylor's own estate, and the discrimination

_____

following deficiencies in SPD personnel's handling of matters immediately before Taylor was shot:  (i) employing an insufficient number of officers, _see_ Gilbertson Report at ¶ 35 (docket no. 90-2) (suggesting that nine officers (three per suspect) should have been present); (ii) failing to adequately identify the undercover ACT members as police, _see id._ at ¶ 44 (speculating that, because Miller and Spaulding had their arms elevated while aiming their weapons at Taylor, the "POLICE" markings on the front of their clothing might have been obstructed); (iii) failing to use less-lethal alternatives; (iv) having more than one officer shout commands; (v) issuing inconsistent directives ("show me your hands" versus "get on the ground"); and (vi) failing to tell Taylor to step away from the Ford Taurus.  Plaintiffs' expert has characterized the "plan, methods, and tactics" used on the day of the shooting as "amateurish, disorganized, and confusing," as well as "sub-standard," "reckless," and "directly linked to [Taylor's] untimely and unnecessary death."  _Id._ at ¶ 51.  With regard to the number of officers involved and how they were deployed, including whether only one officer should have issued commands and what commands should have been given, Gilbertson has the requisite expertise to testify.  To the extent, however, that Gilbertson's conclusions merely comment on the evidence, they are not within the scope of admissible expert testimony.  _See Chaney v. Wadsworth_, 2015 WL 4388420 at *7 (D. Mont. July 15, 2015); _see also S.E.C. v. Daifotis_, 2012 WL 2051193 at *1, *2, & *4 (N.D. Cal. June 7, 2012) (addressing the "all-too-common misuse" of forensic experts who propose "to tell the jury what actually occurred in the case," and cautioning that a retained witness, who has no personal knowledge of the underlying facts, "should never be allowed to pretend to divine for the jury the truth of what actually occurred or what the mental state of an actor was" or to "vouch for one side's fact scenario").  The Court has not considered those types of remarks as substantive evidence or expert opinion, but rather as merely argument advanced by plaintiffs concerning the inferences to be drawn from the facts.

[16] Defendants seek to dismiss minor plaintiff C.M.T.'s substantive due process claim on grounds that, at the time Taylor was killed, C.M.T. had not yet been born, her mother was not married to Taylor, Taylor had a spouse, and C.M.T. therefore had no reasonable expectation of a familial relationship with Taylor.  For support, defendants cite _Lehr v. Robertson_, 463 U.S. 248 (1983), _Smith v. Org. of Foster Families for Equality & Reform_, 431 U.S. 816 (1977), and _Wheeler v. City of Santa Clara_, 894 F.3d 1046 (9th Cir. 2018).  None of these cases is on point.  In _Lehr_, the Supreme Court held that a biological father who failed to participate in the rearing of his child was not entitled to notice before the husband of the child's biological mother adopted the child. 463 U.S. at 249-52, 256-65.  _Smith_ involved the removal of foster children from foster homes. See 431 U.S. at 818-20.  _Wheeler_ concerned a substantive due process claim asserted by the biological son of a woman who died after a confrontation with police, and who had legally severed her relationship with the man by surrendering him, as an infant, for adoption.  894 F.3d at 1057-58.  Defendants offer no evidence that, prior to his death, Taylor renounced his parental responsibilities with respect to C.M.T.

1   claim, however, lack merit, and defendants are entitled to summary judgment as to those

2   claims.

3       1.       **Substantive Due Process**

4           The Court has _twice_ dismissed Brenda Taylor's substantive due process claim with

5   prejudice based on plaintiffs' concessions.  _See_ Order at 11 (docket no. 26); Minute Order

6   at ¶ 1(d) (docket no. 40).  Plaintiffs fail to explain how Brenda Taylor's estate would

7   have a claim that Brenda Taylor did not herself possess before she died.  The § 1983

8   claim brought on behalf of Brenda Taylor's estate is DISMISSED with prejudice.

9           Taylor's own estate is limited to its Fourth Amendment claims, and it may not

10  pursue a Fourteenth Amendment claim for interference with familial relationships.  _See_

11  _Estate of Adomako v. City of Fremont_, 2018 WL 587146 at *6 (N.D. Cal. Jan. 29, 2018)

12  (citing _Curnow v. Ridgecrest Police_, 952 F.2d 321, 325 (9th Cir. 1991)).  The substantive

13  due process claim brought on behalf of Taylor's estate is DISMISSED with prejudice.

14      2.       **Discrimination**

15          The Washington Law Against Discrimination ("WLAD") prohibits discrimination

16  in public accommodations on the basis of race.  _See_ RCW 49.60.030(1)(b).  Defendants

17  contend that plaintiffs cannot establish all of the elements of a WLAD claim because they

18  cannot show Taylor's race was a "substantial factor" in defendants "not treating him in a

19  manner comparable to the treatment" of others outside his protected class.  _See_ _Demelash_

20  _v. Ross Stores, Inc._, 105 Wn. App. 508, 525, 20 P.3d 447 (2001).  Plaintiffs assert that, in

21  contrast to how Taylor, a black male, was treated, the two other individuals in the Ford

22  Taurus were not shot or killed because they were white.  _See_ Resp. at 20 (docket no. 88).

23

ORDER - 26

1  Plaintiffs' contention is undermined by the undisputed facts that the driver and rear

2  passenger of the Ford Taurus were not believed to be armed with a deadly weapon and

3  they made no furtive movement that might have caused officers to be in fear for their

4  own or others' safety.  _See_ Acuesta Report (docket no. 74 at 4); Barnes Report (docket

5  no. 75 at 4-5).  The Court concludes, as a matter of law, that plaintiffs have not presented

6  "affirmative evidence" based on which a rational trier of fact could find that race was a

7  "substantial factor" in the disparate ways in which Taylor and the other occupants of the

8  Ford Taurus were treated.  _See_ _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 257

9  (1986).  Plaintiffs' WLAD claim is DISMISSED with prejudice.

10  **Conclusion**

11       For the foregoing reasons, the Court ORDERS:

12       (1)     Defendants' motion for summary judgment, docket no. 73, is GRANTED

13  in part and DENIED in part, as follows:

14            (a)     Plaintiffs' claims against Acuesta, Barnes, and unknown SPD

15  personnel are DISMISSED;

16            (b)     The § 1983 claim against the City of Seattle is DISMISSED;

17            (c)     The substantive due process claims alleged by Brenda Taylor's

18  estate and Taylor's estate are DISMISSED;

19            (d)     The discrimination claim brought under the WLAD is DISMISSED;

20  and

21            (e)     Defendants' motion is otherwise DENIED.  The negligence, outrage,

22  unlawful arrest, and excessive force claims asserted by Taylor's estate and the

23

ORDER - 27

1  substantive due process claims brought on behalf of Taylor's children and mother

2  remain for trial.  With regard to the still pending § 1983 claims, only Miller and

3  Spaulding are defendants, but the City of Seattle is a defendant as to the state law

4  claims.

5      (2)    Defendants' motion, docket no. 106, for leave to file a motion to strike

6  plaintiffs' surreply and certain declarations, is STRICKEN as moot.

7      (3)    Defendants' motion, docket no. 97, to strike Gilbertson's declaration,

8  docket no. 90, and opinions, is GRANTED in part and DENIED in part; the Court has

9  considered Gilbertson's views only to the extent appropriate in connection with a motion

10 for summary judgment.

11     (4)    The Clerk is directed to update the docket to reflect that Devitta Briscoe

12 sues only in her capacity as executor of Taylor's estate, and not individually, and to send

13 a copy of this Order to all counsel of record.

14     IT IS SO ORDERED.

15     Dated this 1st day of September, 2020.

16

17

18                                    Thomas S. Zilly
                                      United States District Judge

19

20

21

22

23

ORDER - 28